## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| CHARLES J. O'CONNOR, JR. and JUDY A. O'CONNOR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CTO REALTY GROWTH, INC., JOHN P. ALBRIGHT, MATTHEW M. PARTRIDGE, LISA M. VORAKOUN, and PHILIP R. MAYS,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Charles J. O'Connor, Jr. and Judy A. O'Connor ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CTO Realty Growth, Inc. ("CTO" or the "Company"),

1

analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired CTO securities between February 18, 2021 and June 24, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      CTO is a publicly traded real estate investment trust ("REIT") that owns and operates a portfolio of purported high-quality, retail-based properties located primarily in higher growth markets in the U.S.  The Company converted into a REIT in February 2021 and, as of December 31, 2024, owned 23 income properties in seven states, including Ashford Lane, a retail and dining center in Atlanta, Georgia.

3.     Under guidelines established by the SEC, REITs must pay out at least 90% of their taxable profits to shareholders annually as dividends.  In return, REIT companies are exempt from most corporate income tax.  CTO has touted that its operation as a REIT "provides the tax-efficient organizational structure for [its] stockholders" that "will allow [it] to provide them with an attractive and sustainable dividend."

4.     To measure its performance, CTO uses the financial metric Adjusted Funds from Operations ("AFFO").  The AFFO of a REIT, though subject to varying methods of computation, is generally equal to the REIT's funds from operations ("FFO") with adjustments made for recurring capital expenditures (also referred to as "capex") used to maintain the quality of the REIT's underlying assets.  Professional analysts tend to prefer AFFO because it takes into consideration additional costs incurred by the REIT as well as additional income sources, such as rent increases.  Thus, analysts believe that AFFO provides for a more accurate base number when estimating present values and a better predictor of the REIT's future ability to pay dividends.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) CTO's dividends were less sustainable

than Defendants had led investors to believe; (ii) the Company used deceptive and unsustainable practices to artificially inflate its AFFO and overstate the true profitability of its Ashford Lane property; (iii) accordingly, CTO's business and/or financial prospects were overstated; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.    On June 25, 2025, Wolfpack Research ("Wolfpack") published a report entitled "CTO: The B. Riley of REITs" (the "Wolfpack Report" or the "Report"), which compared CTO unfavorably to B. Riley, a financial services company that recently lost more than 90% of its value amid three years of losses, soured investments, delayed financial reports and revelations that the SEC had been investigating whether the firm gave shareholders an accurate picture of its health.  Citing interviews with former employees and whistleblowers, the Wolfpack Report accused CTO of, among other things, "not generat[ing] enough cash to pay its recurring capex and cover its dividends since converting to a REIT in 2021" and instead "rel[ying] on dilution (increasing shares outstanding by 70% since December 2022) to cover a $38 million dividend shortfall from 2021 to 2024," employing a "manipulative definition of [AFFO] where they exclude recurring capex, unlike *all* of their self-identified shopping center REIT peers," and "us[ing] a sham loan to hide the collapse of a top tenant from shareholders at Ashford Lane."  (Emphasis in original).  Further, Wolfpack predicted imminent

further dilution of the Company, noting that CTO has just $8.4 million in cash while facing quarterly dividends of $14 million and average recurring capital expenditures of $5.7 million per quarter, along with approximately $12 million in additional planned capital expenditures.

7.     On this news, CTO's stock price fell $0.98 per share, or 5.42%, to close at $17.10 per share on June 25, 2025.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  CTO is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

13.     Plaintiffs, as set forth in the attached Certification, acquired CTO securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant CTO is a Maryland corporation with principal executive offices located at 369 N. New York Avenue, Suite 201, Winter Park, Florida 32789.  The Company's common stock and 6.375% Series A Cumulative Redeemable Preferred Stock trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbols "CTO" and "CTO-PA," respectively.

15.     Defendant John P. Albright ("Albright") has served as CTO's President and Chief Executive Officer at all relevant times.

16.     Defendant Matthew M. Partridge ("Partridge") served as CTO's Senior Vice President ("SVP"), Chief Financial Officer ("CFO"), and Treasurer from prior to the start of the Class Period to April 2024.

17.    Defendant Lisa M. Vorakoun ("Vorakoun") has served as CTO's Chief Accounting Officer at all relevant times and served as CTO's Interim CFO and Treasurer from April 2024 to June 2024.

18.    Defendant Philip R. Mays ("Mays") has served as CTO's SVP, CFO, and Treasurer since June 2024.

19.    Defendants Albright, Partridge, Vorakoun, and Mays are collectively referred to herein as the "Individual Defendants."

20.    The Individual Defendants possessed the power and authority to control the contents of CTO's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of CTO's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with CTO, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.    CTO and the Individual Defendants are collectively referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

22.    CTO is a publicly traded REIT that owns and operates a portfolio of purported high-quality, retail-based properties located primarily in higher growth markets in the U.S.

**Materially False and Misleading Statements Issued During the Class Period**

23.    The Class Period begins on February 18, 2021, when CTO issued a press release announcing the Company's Q4 and full year 2020 operating results. The press release stated, in relevant part:

> "We are pleased with the progress we made during 2020 as we accomplished a record number of company-specific operational and transactional initiatives, with our fourth quarter REIT conversion representing the culmination of our multi-year process to reposition CTO Realty Growth into a high-quality, publicly traded diversified REIT," said [Defendant] Albright[.] "This was a terrific year of execution for our team as we managed $336 million of real estate transaction activity, maintained strong cash flow in the face of the unprecedented pandemic, delivered year-over-year FFO per share growth of more than 90%, ***and completed our REIT conversion, which we believe provides the most tax-efficient organizational structure for our stockholders, and will allow us to provide them with an attractive and sustainable dividend***."[1]

---

[1] All emphases included herein are added unless otherwise indicated.

24.    On February 19, 2021, CTO hosted an earnings call with investors and analysts to discuss the Company's Q4 2020 results (the "Q4 2020 Earnings Call").  During the scripted portion of the Q4 2020 Earnings Call, Defendant Albright stated, in relevant part:

> Our transition to a REIT has been a long and winding process. ***But we believe that benefits of the structure for shareholders now and in the future are numerous. With our REIT election, we've instituted a regular quarterly cash dividend that allows us to effectively pass along the income of the company to our shareholders. Additionally, our REIT status now allows us to be more appropriately compared to other companies owning and managing similar real estate investments***. And as you saw with our earnings release and supplemental financial report yesterday, has served as a catalyst for improved financial reporting that we hope will drive a more comparable valuation to our new peers.
>
> ***
>
> Shifting the focus to the future, we're now more than a month into 2021. And we're excited about our property level initiatives for the upcoming year and early indications of leasing activity at number of our properties. As we have announced in the fourth quarter we have begun the rebranding process for Ashford lane, which was previously known as Perimeter Place. The rebranding, when combined with some strategic capital investments and thoughtful retentiveness certain spaces is going to allow us to meaningfully drive in place yields over the next few years.

25.    Also during the scripted portion of the Q4 2020 Earnings Call, Defendant Patridge stated, in relevant part:

> For the fourth quarter of 2020, funds from operations were 10.1 million or $2.11 per diluted share. This represents a 174% year-over-year increase from the fourth quarter of 2019. ***Adjusted funds from operations for the fourth quarter of 2020 were 10.6 million or $2.20***

*per diluted share and this represents a 210% year-over-year increase from the fourth quarter of 2019.*

\*\*\*

As highlighted in Tuesday's press release, our Board of Directors has approved and the company has declared a first quarter regular cash dividend of $1 per share to be paid on March 31, 2021 to stockholders of record as of the close of business on March 22, 2021. This first quarter cash dividend represents a 400% year-over-year increase over the company's first quarter 2020 cash dividend and an annualized yield of almost 8%.

This is the 45th consecutive year in a row that the company has paid a cash dividend *and it's consistent with the company's previously announced dividend policy providing a reliable and consistent dividend to our shareholders*.

*I would like to note that we expect our dividend payout ratios relative to AFFO to be in a range of 90% to 100% annually. This is a higher ratio than most other REITS and it's a product of our low taxable depreciation, which increases our overall taxable income and must be paid out in order to maintain our REIT status.*

26.     On March 5, 2021, CTO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K").  In discussing the Company's business plan, the 2020 10-K stated, in relevant part, that CTO's investment strategy seeks to acquire "income properties, primarily multi-tenants, which will continue to broaden the credit base of our lease tenants, diversify our income property portfolio geographically, with an emphasis on major markets and growth markets in the U.S., and diversify the type of income-producing properties.

10

27.     Further, in providing an overview of CTO's income properties, the 2020 10-K stated, in relevant part, "[w]e believe investment in income-producing assets provides attractive opportunities *for generally stable cash flows and increased returns over the long run through potential capital appreciation*."

28.     In addition, in discussing non-U.S. Generally Accepted Accounting Principles ("GAAP") financial measures the Company uses to present its financial results, the 2020 10-K stated, in relevant part:

> Our reported results are presented in accordance with GAAP. We also disclose Funds From Operations ("FFO") and Adjusted Funds From Operations ("AFFO"), both of which are non-GAAP financial measures. ***We believe these two non-GAAP financial measures are useful to investors because they are widely accepted industry measures used by analysts and investors to compare the operating performance of REITs***.

***

> To derive AFFO, we modify the NAREIT computation of FFO to include other adjustments to GAAP net income related to non-cash revenues and expenses such as straight-line rental revenue, amortization of deferred financing costs, amortization of capitalized lease incentives and above- and below-market lease related intangibles, and non-cash compensation. Such items may cause short-term fluctuations in net income but have no impact on operating cash flows or long-term operating performance. We use AFFO as one measure of our performance when we formulate corporate goals.

***

> We believe that Core FFO and AFFO are additional useful supplemental measures for investors to consider ***because they will help them to better assess our operating performance without the distortions created by other non-cash revenues or expenses***.

11

Conspicuously, the 2020 10-K failed to acknowledge that CTO excludes recurring capital expenditures in calculating AFFO.

29.    Appended to the 2020 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Albright and Partridge attesting that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

30.    On April 29, 2021, CTO issued a press release announcing the Company's Q1 2021 operating results.  The press release stated, in relevant part:

> "The first quarter was a strong start to the year as we completed our uplisting to the NYSE, continued to opportunistically sell legacy single tenant properties at attractive cap rates, and reinvest into high-quality, multi-tenanted properties at higher yields in the growing Salt Lake City, UT and Las Vegas, NV markets," said [Defendant] Albright[.] "These transactions resulted in approximately 130 basis points of spread between the weighted-average cap rate of our dispositions and the comparable reinvestment yields of our acquisitions, which has been a consistent theme of our portfolio repositioning efforts as we continue our evolution into a best-in-class, diversified REIT. ***As we look to accelerate our pace of dispositions in the 2nd and 3rd quarters, we expect to continue this trend, which should drive increased earnings per share growth and further support our attractive 7.6% dividend yield***."

31.    On April 30, 2021, CTO hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call").

During the scripted portion of the Q1 2021 Earnings Call, Defendant Albright stated, in relevant part:

> [W]e continue to focus on our property repositioning programs and leasing initiatives, where it made solid progress during the first quarter. ***Of note, we are through the design phase of Ashford Lane rebranding, and we are starting to see increased leasing activity at the property. To provide some figures for context, we are at least negotiating LOIs with more than five different tenants. So while still in the early stages with some of the opportunities, there has been a very positive reception to what we're doing with the property***.

32.    Also during the scripted portion of the Q1 2021 Earnings Call, Defendant Partridge stated, in relevant part:

> Our AFFO in the first quarter was also positively impacted by approximately $220,000 repayments of deferrals related to the previously mentioned rent referral agreements.
>
> We do anticipate a continued positive impact to our AFFO in future periods 2021 from the scheduled repayments to previously deferred rent, with the second quarter of 2021 representing the height of the repayment obligations. As previously announced the company paid a first quarter regular cash dividend of $1 per share on March 31 to shareholders of record on March 22. And as we highlighted in yesterday's press release, our Board of Directors has approved and the company has declared a second quarter cash dividend of $1 per share to be paid on June 30, 2021 to stockholders of record as of the close of business on June 21, 2021.

33.    On July 29, 2021, CTO issued a press release announcing the Company's Q2 2021 operating results.  The press release stated, in relevant part:

> "We are encouraged by our second quarter execution and the progress we are making in constructing a high-quality multi-tenant, retail-based portfolio," commented [Defendant] Albright[.] "We acquired a high-quality, class A, mixed use property in the Dallas market for $72.5

million and we continued to make good progress with the disposition of our single tenant assets, which totaled $61 million in the second quarter. The contract purchaser for the remaining Daytona Beach land holdings is in due diligence and we look forward to accretively reinvesting the expected proceeds into our core strategy. ***The combination of all of this activity, in addition to acquisition and disposition opportunities we anticipate materializing in the back half of the year, has us well-positioned to drive strong AFFO growth in 2022 as we execute on our diversified, retail-based investment strategy***."

34.    On July 30, 2021, CTO hosted an earnings call with investors and analysts to discuss the Company's Q2 2021 results (the "Q2 2021 Earnings Call"). During the scripted portion of the Q2 2021 Earnings Call, Defendant Albright stated, in relevant part:

> From a new leasing perspective, we signed 6 new leases in the quarter and average rate of more than $21 per square foot with the most notable being Superica at Ashford Lane. I am pleased to say we are continuing to build leasing momentum for the back half of the year as we work through a number of LOIs and actively negotiating more than 1.5 a dozen leases at various properties.

35.    Also during the scripted portion of the Q2 2021 Earnings Call, Defendant Partridge stated, in relevant part:

> [O]ur AFFO in the second quarter was positively impacted by approximately $434,000 of repayments of deferrals related to the previously mentioned rent deferral agreements.

***

> Our second quarter cash dividend represents a 300% year-over-year increase when compared to the company's second quarter 2020 cash dividend and an annualized yield is approximately 7.4%. Our

14

quarterly dividend represents a cash payout ratio of 94% of Q2 2021 AFFO per share.

\*\*\*

And finally, we did update our 2021 guidance yesterday, increasing the midpoint of our AFFO per share range and increasing our acquisitions and disposition guidance to account for our year-to-date performance and expected activity in the back half of the year.

36.     On October 28, 2021, CTO issued a press release announcing the

Company's Q3 2021 operating results.  The press release quoted Defendant

Albright as stating, in relevant part:

> The net investment spreads we have been able to generate to-date on the strategic sale of non-core assets and the redeployment of those proceeds, ***combined with anticipated strong growth in 2022 same-store net operating income and the ample liquidity on our balance sheet for investment into our pipeline of high-quality, multi-tenanted retail and mixed-use properties, is positioning us for very attractive FFO and AFFO growth in 2022***.

37.     On October 29, 2021, CTO hosted an earnings call with investors and

analysts to discuss the Company's Q3 2021 results (the "Q3 2021 Earnings Call").

During the scripted portion of the Q3 2021 Earnings Call, Defendant Albright

stated, in relevant part:

> [W]e anticipate continued momentum into the fourth quarter as we work to finalize number of leases at Ashford lane to accelerate that properties redevelopment, particularly now that we have started to make meaningful progress on the lawn.

\*\*\*

15

Using our current share count and the, low end of our current acquisition cap rate guidance as a reinvestment rate. *We have the opportunity to organically grow AFFO per share by more than 15% when compared to the midpoint of our 2021 AFFO guidance. On a leveraged neutral basis that could result in approximately $0.75 of additional AFFO per share. When you combine that organic growth with the lift we're going to get from our reinvestment and project leasing, we're very excited about our future earnings potential and what that can mean for our shareholders*.

38.     Also during the scripted portion of the Q3 2021 Earnings Call, Defendant Partridge stated, in relevant part:

For the third quarter of 2021, funds from operations increased to $6.1 million or $1.03 per share and adjusted funds from operations were $6.4 million or $1.09 per share.

***

As previously announced, the company paid a third quarter regular cash dividend of $1 per share on September 30, to shareholders of record on September 9. Our third quarter cash dividends represents a 150% year-over-year increase when compared to the company's third quarter 2020 cash dividends and an annualized yield of approximately 7.4%. *Our quarterly dividend represents a cash payout ratio of 92% of Q3 AFFO per share, and we're currently tracking the payout approximately 100% of taxable income for 2021*.

*As we turn to our balance sheet, we are well positioned to support the growth [Defendant Albright] talked about in the fourth quarter and into 2022*.

39.     During the Q&A portion of the Q3 2021 Earnings Call, when asked whether the "food hall operator at Ashford Lane" has "translated yet to increased leasing activity and interest in" Ashford Lane, Defendant Albright responded, in relevant part:

16

So I'll give you a little bit of background on the food hall as far as where they are just as an opportunity since you bring it up. That's the whole supply chain thing. Is this like, it's definitely hit the real estate side as well because the food hall is basically accessing a lot of their inventory, if any, from China. And I'll have to tell you what that means. So they're looking at more end of the year opening and when we sign this up, we thought it was going to be summer of this year, so a couple of months ago. And so, but they're making very good progress there about 80% built out.

40.    On January 5, 2022, the Company issued a press release entitled "CTO Realty Growth Announces Record 2021 Transaction Activity."  The press release quoted Defendant Albright as stating, in relevant part, "we're excited about the progress we've made towards building a best-in-class retail-based portfolio *that we believe can drive increased cash flow and strong 2022 earnings growth, further supporting our very attractive dividend*."

41.    On February 24, 2022, CTO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K").  The 2021 10-K contained substantively similar descriptions of the Company's business plan, income properties, and non-GAAP financial measures as discussed, *supra*, in ¶¶ 26-28, and appended to the 2021 10-K as exhibits were signed certifications pursuant to SOX by Defendants Albright and Partridge attesting that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

42.    That same day, CTO issued a press release announcing the

Company's Q4 and full year 2021 operating results.  The press release stated, in

relevant part:

> "2021 marked our first full year as a REIT and the culmination of our
> decade-long transformation from a substantial Florida landowner to a
> growth market-focused, retail-driven income property owner. ***We had
> a record year of transaction and capital markets activities, and we
> are well-positioned to drive outsized earnings growth as we shift
> from a capital recycling strategy and place a greater emphasis on
> organic and external opportunities***," commented [Defendant]
> Albright[.] "We're entering 2022 with a portfolio positioned to
> highlight our strong growth market-based strategy, highlighted by our
> top markets of Atlanta, Jacksonville, Dallas, Raleigh and Phoenix.
> ***With AFFO per share guidance implying more than 15% year-over-
> year growth at the midpoint and excellent leasing momentum at a
> number of our properties, we're looking forward to delivering
> another strong year of performance for our shareholders***."

43.    On February 25, 2022, CTO hosted an earnings call with investors

and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings

Call").  During the scripted portion of the Q4 2021 Earnings Call, Defendant

Albright stated, in relevant part:

> As we reflect on our more recent activities in 2021 and the impact of
> those activities we have on the future, ***I'm very pleased with the
> advances we have made to further improve our high-quality
> portfolio and how we've positioned CTO to drive outsized AFFO
> growth through a combination of organic and external
> opportunities***.
>
> ***
>
> Operationally, we ended the quarter with economic occupancy of
> nearly 89% in leased occupancy of more than 92%, reflecting the

significant progress we've made in executing on our repositioning plan at Ashford Lane and the incremental gains across a number of our properties in our portfolio. During the fourth quarter, we signed new leases at an average rent more than $41 per square foot. Most of the new leases were at Ashford Lane in Atlanta, where we are currently under construction on the lawn, which we expect to be completed in late spring or early summer.

***

**For 2022, we provided guidance that has the top end of the range, poised to deliver 18% AFFO per share growth. Our recently announced dividend increase provides a growing outsized dividend yield with improved AFFO coverage**. And all of this is driven by our high-quality portfolio that is based on some of the strongest markets in the United States.

44.    Also during the scripted portion of the Q4 2021 Earnings Call,

Defendant Partridge stated, in relevant part:

**Our 2021 AFFO was $4.36 per share and represents a $0.16 per share beat at the top end of our AFFO guidance range**.

As previously announced in November, the company paid a fourth quarter regular common stock cash dividend of $1 per share on December 30. And earlier this week, we announced an 8% increase for our first quarter 2022 regular common stock cash dividend, which will be paid on March 31 to shareholders of record on March 10.

***

The midpoint of our AFFO guidance implies 15% year-over-year growth, which is driving our recently increased dividend and is also significantly improving the overall coverage of our dividend as we look to maximize free cash flow. Overall, 2022 is shaping up to be another strong year of growth as we capitalize on our momentum from 2021.

45.     During the Q&A portion of the Q4 2021 Earnings Call, when asked to

"talk about the strategy about how much [the Company] think[s] that's getting

recognized in the marketplace versus retaining some excess cash flow here to fund

the investment pipeline," and whether "that increase driven by necessity or just

how [CTO] [was] thinking about the dividend increase here versus the cash flow,"

Defendant Partridge responded, in relevant part:

> [W]e're very focused on maximizing cash flow. So when you see us
> do a dividend increase, it's largely to track to 100% payout of taxable
> income. We're not -- we're not increasing it just to continue to
> increase the dividend for the sake of doing it. We're trying to be pretty
> efficient with retained cash flow. In terms of the market recognition, I
> think as we continue to improve the payout ratio, as you noted, we're
> in the mid-80s now for an AFFO payout ratio, which is much more
> palatable for people. I think we'll start to get more recognition for the
> dividend and the outsized yield that we're providing, but obviously,
> coming into this year, it was more elevated. So I think that's a good
> step forward.

46.     On April 28, 2022, CTO issued a press release announcing the

Company's Q1 2022 operating results.  The press release quoted Defendant

Albright as stating, in relevant part: "I'm very pleased with our strong start to the

year. We achieved Same-Property [net operating income ("NOI")] growth of

nearly 18% in the first quarter *as our operational successes in 2021 have driven*

*outsized organic cash flow growth in our recently acquired, retail-focused*

*portfolio*[.]"

47.    On April 29, 2022, CTO hosted an earnings call with investors and analysts to discuss the Company's Q1 2022 results (the "Q1 2022 Earnings Call"). During the scripted portion of the Q1 2022 Earnings Call, Defendant Partridge stated, in relevant part, "[o]ur quarterly dividend represents a cash payout ratio of 73% of Q1 2022 AFFO per share and we continue to work towards efficiently paying out approximately 100% of taxable income in 2022."

48.    On July 28, 2022, CTO issued a press release announcing the Company's Q2 2022 operating results.  The press release quoted Defendant Albright as stating, in relevant part that CTO "continues to make strong operational progress with [its] leasing and repositioning initiatives and finds attractive opportunities for external growth through [its] disciplined, retail-focused investment strategy" and that the Company's "embedded growth should continue to help drive strong earnings for the foreseeable future and further support [its] *attractive and growing dividend*."

49.    On July 29, 2022, CTO hosted an earnings call with investors and analysts to discuss the Company's Q2 2022 results (the "Q2 2022 Earnings Call"). During the scripted portion of the Q2 2022 Earnings Call, Defendant Partridge stated, in relevant part:

> For the second quarter of 2022, core FFO grew 60% to $1.41 per share and AFFO grew 38% to $1.48 per share.

***

As previously announced, the company paid a second quarter regular cash dividend of $1.12 per share, which is a 12% year-over-year increase over the company's Q2 2021 cash dividend and a 4% increase over our Q1 2022 quarterly cash dividend and a current stock split adjusted annualized yield of approximately 7%. Our quarterly dividend represents a cash payout ratio of 76% of Q2 2022 AFFO per share, and we continue to work towards efficiently paying out approximately 100% of taxable income in 2022.

50.    On October 28, 2022, CTO hosted an earnings call with investors and analysts to discuss the Company's Q3 2022 results (the "Q3 2022 Earnings Call"). During the scripted portion of the Q3 2022 Earnings Call, Defendant Albright stated, in relevant part:

We also completed a number of capital markets transactions that fortified our balance sheet, continue to have good success with our leasing initiatives and drove more than 36% year-over-year AFFO growth during the quarter.

\*\*\*

This was a great quarter of execution regardless of some of the challenges at hand. We believe our rock-solid balance sheet, strong market, high-quality portfolio and embedded same-store NOI growth from our year-to-date and future leasing activity, have us well positioned to continue delivering outsized earnings and cash flow growth through the end of the year and for the foreseeable future.

51.    Also during the scripted portion of the Q3 2022 Earnings Call, Defendant Partridge stated, in relevant part:

And third quarter 2022 AFFO was $0.49 per share representing, a 36% increase over the third quarter of 2021.

Year-to-date core FFO was $1.41 per share and AFFO was $1.47 per share representing, a year-over-year per share growth of 55% and 41% respectively when compared to the first nine months of 2021.

*** 

As previously announced, the company paid a third quarter regular cash dividend of $0.38 per share on September 30, to shareholders of record on September 12. Our quarterly dividend represents a 14% year-over-year increase over the company's Q3, 2021 cash dividend and a 1.8% increase over our Q2, 2022, quarterly cash dividend and a current annualized yield of approximately 7.6%. This represents a Q3, 2022 AFFO per share cash payout ratio of 78%.

*** 

Our new AFFO per share guidance range of $1.79 to $1.82 per share, which is an increase of $0.09 per share at the low end and $0.06 per share at the high end.

52.    During the Q&A portion of the Q3 2022 Earnings Call, when asked to provide an update of the leasing efforts at Ashford Lane, Defendant Albright responded, in relevant part:

Ashford Lane has been incredibly busy. We're in a great situation there in that we've signed a restaurant tenant for the last remaining space at the lawn and we'll be moving that tenant that's there now to the second floor office space. So we've upgraded that use in a much higher paying tenant. And then we're getting -- we're leasing office vacancy with relocating the existing tenant.

And then we've had another lease sign this week, smaller tenants. And we have two or three other leases in the works right now. So it feels really good that this one is going to be fully stabilized by the end of the year or first quarter next year. But there could be a situation where we just wait for the right tenant on some of the spaces that are left. But yeah everything has been very strong there.

53.     On February 23, 2023, CTO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K contained substantively similar descriptions of the Company's business plan and non-GAAP financial measures as discussed, *supra*, in ¶¶ 26 and 28, and appended to the 2022 10-K as exhibits were signed certifications pursuant to SOX by Defendants Albright and Partridge attesting that "[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

54.     That same day, CTO issued a press release announcing the Company's Q4 and full year 2022 operating results. The press release quoted Defendant Albright as stating, in relevant part:

> "*We enter 2023 with a tremendous amount of opportunity to grow long-term portfolio-level cash flow as we lease up acquired vacancy and benefit from the resilient tenant demand and consumer traffic strength occurring in many of our top markets*. Our well-positioned balance sheet has ample liquidity for targeted investment and we're hopeful that we'll see more attractive acquisition opportunities as the year progresses. *When we combine our growth prospects with our expanding pipeline of signed leases that have yet to commence rent and our attractive 8.1% dividend yield, we're optimistic we can bring all of these components together to drive long-term shareholder value*."

55.     On February 24, 2023, CTO hosted an earnings call with investors and analysts to discuss the Company's Q4 2022 results (the "Q4 2022 Earnings

Call"). During the scripted portion of the Q4 2022 Earnings Call, Defendant

Albright stated, in relevant part:

> Our activity during the fourth quarter capped off another record year, which resulted in full year core FFO per share growth of 35% and full year AFFO per share growth of 26%. The fourth quarter was especially noteworthy because it was our largest quarter ever in terms of investment volume and included the first follow-on equity offering in the history of the company, while 2022 was very productive across all aspects of our business[.]

> ***

> And finally, The Hall at Ashford Lane, we provide some near-term relief as a tenant has experienced delays in opening as a result of supply chain disruptions and increasing costs to their build-out, which has presented an opportunity for us to obtain more operational transparency and a more attractive percentage rent thresholds.

56.    Also during the scripted portion of the Q4 2022 Earnings Call,

Defendant Partridge stated, in relevant part:

> For the year, core FFO was $1.74 per share and AFFO was $1.83 per share, representing year-over-year per share growth of 35% and 26%, respectively, when compared to 2021.

> Full year core FFO and AFFO year-over-year comparisons benefited from 13% same-property NOI growth, increased interest income from structured investments, growth in time-related management fees and dividend income, and was partially offset by higher relative interest expense.

> As we previously announced in November, the company paid a fourth quarter regular cash dividend of $0.38 per share on December 30th. And earlier this week, the company declared its first quarter 2023 regular common stock cash dividend of $0.38 per share, which will be paid on March 31st to shareholders of record on March 9th.

25

Our first quarter dividend represents a 5.6% increase over the company's Q1 2022 cash dividend and an annualized yield of more than 8%.

57.    On April 27, 2023, CTO issued a press release announcing the

Company's Q1 2023 operating results.  The press release stated, in relevant part:

"We are pleased with what has been an active start to the year, and while the underlying macroeconomic environment remains volatile, the quality of our assets, our diverse income streams, and strength of our Sunbelt-focused markets have allowed us to make positive strides in our value-add initiatives, ***driving attractive leasing spreads during the quarter and positioning our properties for long-term cash flow growth***," said [Defendant] Albright[.] "Our growing signed but not open pipeline and increasing tenant demand at our two more recent acquisitions, West Broad Village and The Collection at Forsyth, are building operational tailwinds for 2023, 2024 and beyond. ***As a result, we have improved visibility that gives us additional confidence in our long-term value proposition for our shareholders and supports the attractiveness of our outsized 9.1% common dividend***."

58.    On April 28, 2023, CTO hosted an earnings call with investors and

analysts to discuss the Company's Q1 2023 results (the "Q1 2023 Earnings Call").

During the scripted portion of the Q1 2023 Earnings Call, Defendant Albright

stated, in relevant part:

Since we purchased Ashford Lane just before the pandemic in early 2020, we have repositioned the property as a premier lifestyle center in the infill Perimeter submarket of Atlanta, Georgia. As part of our repositioning efforts, we re-tenanted previously vacant units up to the overall tenant mix by turning over approximately one-third of the square footage with new tenants and reintegrated the community with creation of our well-received green space, The Lawn.

26

59.    Also during the scripted portion of the Q1 2023 Earnings Call,

Defendant Partridge stated, in relevant part:

> Per our previous announcement in February, we paid a first quarter
> regular cash dividend of $0.38 per share, which is a 5.6% increase
> over our Q1 2022 cash dividend and a very attractive current
> annualized yield of approximately 8.8%. Our quarterly dividend
> represents a cash payout ratio of 88% of Q1 2023 AFFO per share,
> and we continue to work towards efficiently paying out approximately
> 100% of projected 2023 taxable income.

60.    On July 27, 2023, CTO issued a press release announcing the

Company's Q2 2023 operating results.  The press release quoted Defendant

Albright as stating, in relevant part, "we believe that our growing signed but not

open pipeline, which now represents more than 3% of current in-place cash base

rents, has us well-positioned to drive outsized growth for the benefit of our ***very***

***attractive 8.5% common dividend***."

61.    On July 28, 2023, CTO hosted an earnings call with investors and

analysts to discuss the Company's Q2 2023 results (the "Q2 2023 Earnings Call").

During the scripted portion of the Q2 2023 Earnings Call, Defendant Albright

stated, in relevant part:

> Camp recently opened its first Atlanta location at our Ashford Lane
> property. And its initial sales performance has been impressive.
> Grana, which is set to open at Ashford Lane before the end of the
> month in the former Carrabba's space has been highly anticipated as a
> new opening.
>
> On the flip side, we are in the process of bringing in a much more
> established food hall operator to take over our food hall tenant at

Ashford Lane. We expect that the new operator will be up and
running in the fourth quarter.

Overall, even with the interim closure of food hall, we've maintained
our full year earnings guidance as leasing momentum continues to be
robust. We've made good progress implementing our operational
efficiency programs and we have confidence our high-quality
portfolio will drive long-term cash flow as we continue to execute our
operating plan.

62.    Also during the scripted portion of the Q2 2023 Earnings Call,

Defendant Partridge stated, in relevant part, "we distributed a second quarter

regular cash dividend of $0.38 per share. This marks a 1.8% increase compared to

the second quarter 2022 cash dividend resulting in a Q2 2023 AFFO payout ratio

of 79% and an attractive annualized yield of approximately 8.5%."

63.    On October 27, 2023, CTO hosted an earnings call with investors and

analysts to discuss the Company's Q3 2023 results.  During the scripted portion of

the Q3 2023 Earnings Call, Defendant Albright stated, in relevant part:

I'm pleased to announce we had a strong quarter of operational
execution that led us to meaningfully increase our full year FFO and
AFFO guidance. The strength in our numbers were driven by better-
than-forecasted tenant retention for lease renewals, accelerated new
tenant rent commencements, outsized percentage rent from food and
beverage and theater operators and improved expense controls, where
we have direct cost exposure.

64.    Also during the scripted portion of the Q3 2023 Earnings Call,

Defendant Partridge stated, in relevant part, "[f]rom a guidance perspective, we are

***increasing our 2023 core FFO and AFFO earnings guidance*** to take into account

our third quarter results and go-forward expectations regarding investments, dispositions, capital markets activities and property operations."

65.    On February 22, 2024, CTO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2023 (the "2023 10-K").  The 2023 10-K contained substantively similar descriptions of the Company's business plan and non-GAAP financial measures as discussed, *supra*, in ¶¶ 26 and 28, and appended to the 2023 10-K as exhibits were signed certifications pursuant to SOX by Defendants Albright and Partridge attesting that "[t]he information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

66.    On February 23, 2024, CTO hosted an earnings call with investors and analysts to discuss the Company's Q4 2023 results (the "Q4 2023 Earnings Call").  During the scripted portion of the Q4 2023 Earnings Call, Defendant Albright stated, in relevant part, "[w]e had a terrific fourth quarter of execution in nearly all aspects of our business, resulting in core FFO and AFFO per share growth of 41%, which was meaningfully ahead of our expectations and consensus estimates."

67.    Also during the scripted portion of the Q4 2023 Earnings Call, Defendant Partridge stated, in relevant part:

As we previously announced, the company paid a fourth quarter regular cash dividend of $0.38 per share in December, resulting in a Q4 2023 AFFO payout ratio of 73% and earlier this week, the company declared its first quarter 2024 regular common stock cash dividend of $0.38 per share, which is payable on March 28 to shareholders of record on March 14. ***This is the company's 48th consecutive year of declaring a common dividend and the $0.38 per share represents a very attractive current annualized yield of approximately 9.2%***.

68.    On May 3, 2024, CTO hosted an earnings call with investors and analysts to discuss the Company's Q1 2024 results (the "Q1 2024 Earnings Call"). During the scripted portion of the Q1 2024 Earnings Call, Defendant Vorakoun stated, in relevant part, "[a]s we announced in February, we distributed a first quarter regular cash dividend of $0.38 per share resulting in a Q1 2024 AFFO payout ratio of 73% and an attractive current annualized yield of approximately 8.8%."

69.    On July 25, 2024, CTO issued a press release announcing the Company's Q2 2024 operating results.  The press release quoted Defendant Albright as stating, in relevant part, "[g]iven our solid earnings and increased investment activity outlook, ***we have increased our full-year Core FFO and AFFO guidance by 11.9% and 11.0%, respectively, at the mid-points of the ranges, and are looking forward to an active second half of 2024***."

70.    On July 26, 2024, CTO hosted an earnings call with investors and analysts to discuss the Company's Q2 2024 results (the "Q2 2024 Earnings Call").

During the scripted portion of the Q2 2024 Earnings Call, Defendant Albright stated, in relevant part:

> Starting with our operating business, we had another successful quarter of leasing activity. In the second quarter, we signed 79,000 square feet of new leases, renewals and extensions at an average rent of $25.87 per square foot, bringing our leasing activity to 183,000 square feet at an average rent of $26.58 per square foot for the first half of 2024. This leasing activity was spread across our portfolio, ***but heaviest at Ashford Lane in Atlanta*** and West Broad Village in Richmond.

71.    Also during the scripted portion of the Q2 2024 Earnings Call, Defendant Mays stated, in relevant part, "[a]s we announced in May, we distributed a second quarter regular cash dividend of $0.38 per share resulting in a Q2 2024 AFFO payout ratio of 79% and at an attractive current annualized yield of approximately 8%."

72.    On October 25, 2024, CTO hosted an earnings call with investors and analysts to discuss the Company's Q3 2024 results (the "Q3 2024 Earnings Call"). During the scripted portion of the Q3 2024 Earnings Call, Defendant Mays stated, in relevant part, that the Company "continues to have positive leasing momentum," and "the result of this momentum is evident in our same-property NOI growth of 6.3% for the quarter. ***This growth was spread among our same-property portfolio, but primarily driven by growth at Ashford Lane***, the Collection at Foresight, the Shops at Legacy and Price Plaza."

73.    On February 20, 2025, CTO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2024 (the "2024 10-K"). The 2024 10-K contained substantively similar descriptions of the Company's business plan and non-GAAP financial measures as discussed, *supra*, in ¶¶ 26 and 28, and appended to the 2024 10-K as exhibits were signed certifications pursuant to SOX by Defendants Albright and Mays attesting that "[t]he information contained in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

74.    The statements referenced in ¶¶ 23-73 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) CTO's dividends were less sustainable than Defendants had led investors to believe; (ii) the Company used deceptive and unsustainable practices to artificially inflate its AFFO and overstate the true profitability of its Ashford Lane property; (iii) accordingly, CTO's business and/or financial prospects were overstated; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

75.    On June 25, 2025, Wolfpack published a report entitled "CTO: The B.
Riley of REITs."  Citing interviews with former employees and whistleblowers,
the Wolfpack Report accused CTO of, among other things, "not generat[ing]
enough cash to pay its recurring capex and cover its dividends since converting to
a REIT in 2021" and instead "rel[ying] on dilution (increasing shares outstanding
by 70% since December 2022) to cover a $38 million dividend shortfall from 2021
to 2024," employing a "manipulative definition of [AFFO] where they exclude
recurring capex, unlike *all* of their self-identified shopping center REIT peers," and
"us[ing] a sham loan to hide the collapse of a top tenant from shareholders at
Ashford Lane."  (Emphasis in original).

76.    Wolfpack began the Report by stating that "Management Is Making
More Money for Themselves by Overpaying for Properties, Cutting Capex, and
Diluting Rather than Trying to Right the Ship."  In concluding that "[m]anagement
knows CTO is a sinking ship," and that the Company was relying on dilutions to
cover its significant dividend shortfall, Wolfpack focused on CTO's lack of core
cash flows.  For example, Wolfpack noted that "[i]n Q1 2025, CTO's operating
cash flow fell to just $10.3 million, whereas total dividends declared were $14.1
million, due in part to the increased number of outstanding shares."



77.     Wolfpack claimed that its analysis "shows management makes more money for themselves sabotaging the future of the company by overpaying for properties" and "[m]anagement is further handicapping its future by slashing capex below the inadequate levels it was at in prior years when the company's portfolio was smaller."  Ultimately, Wolfpack stated that it "think[s] management knows it cannot win against [CTO's peers], and that is driving them to loot CTO before it goes under."



78.    Wolfpack also stated that, after speaking with former employees and whistleblowers, it has discovered that CTO "used a sham loan to hide the collapse of a top tenant from shareholders at Ashford Lane." The Report states that in Q4 2020, The Hall at Ashford Lane ("Food Hall"), "was listed as a top tenant, with an annualized rent of $706,000." However, Wolfpack claims that "behind the scenes, this project was a disaster. Supply shocks due to the covid lockdowns caused project costs to balloon, slowing down time to completion."

79.    According to Wolfpack, "management proceeded with a plan that would keep investors in the dark and make it appear the tenant was actually paying more in rent." Specifically, Wolfpack claims that "CTO provided a $1.5 million 'loan' to the tenant to finish the construction, but according to someone familiar

with the matter, CTO never relinquish[ed] control over the money and instead directed that money to the contractors." As a result, Wolfpack stated that "instead of telling investors that the Food Hall was defaulting, costing CTO $1.5 million in capex in the process, management was able to boast to investors that it was increasing rent for a top tenant."

80.    The Wolfpack Report also discussed the Company's "manipulative definition" of AFFO, claiming that by excluding recurring capex, CTO "trick[ed] investors into hopping onto this never-ending dilution merry-go-round." The Wolfpack Report states that not only does management use its AFFO to "lure in unsuspecting investors," but it uses that same non-GAAP metric for 70% of its performance pay, inflating $8 million in bonuses we think they never should have received."

81.    Wolfpack states that CTO is "Obscuring the Fact that Their Core Cash Flows from Operations Have Never Been Enough to Cover Their Dividend and Pay for Recurring Capex with an AFFO Metric That Is an Aberration from Their Peers." As an example to support this clam, the Wolfpack Report states that CTO reported AFFO of $50.7 million in 2024, or $2.00 per share, and notes that "[c]onsidering that the common stock dividends paid in 2024 totaled $40 million, it seems that the dividend is amply covered." However, Wolfpack states that "CTO's Supplemental disclosure package reveals that capex (including tenant

allowances, leasing commissions, and other capital improvements) for 2024 was $20.9 million.

| Total Capital Investments | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 | 2024 |
|---|---|---|---|---|---|
| Capital Expenditures and Other Capital Investments | $1,014 | $664 | $1,001 | $3,484 | $6,163 |
| Tenant Improvement Allowances | 1,281 | 2,516 | 2,709 | 4,589 | 11,095 |
| Leasing Commissions | 1,030 | 247 | 1,030 | 1,321 | 3,628 |
| **Total Capital Investments** | **$3,325** | **$3,427** | **$4,740** | **$9,394** | **$20,886** |

Source: CTO Supplemental Investor Materials[48]

Wolfpack goes on to say that "[f]actoring in this real cash expense, we calculate CTO's industry standard would have been $29.9 million, leaving a $10 million shortfall after paying common shareholders their dividend in 2024" and "when [Wolfpack] look[s] back at the last three years, [Wolfpack] can see that CTO's core cash flows from operations in the aggregate had a $31.2 million shortfall in covering the paid common dividends."

| Wolfpack Estimate of CTO's True AFFO | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| Per Industry Standards | | | |
| **Reported AFFO** | 33,925 | 43,073 | 50,773 |
| (-) Leasing Capital Expenses | | | |
| (-) Capital Expenditures and Other Capital Investments | n.a. | (8,925) | (6,163) |
| (-) Tenant Improvement Allowances | (7,141) | (14,101) | (11,095) |
| (-) Leasing Commissions | (2,174) | (2,350) | (3,628) |
| **Industry Standard AFFO** | **24,610** | **17,697** | **29,887** |
| (-) Dividends Paid - Common Stock | (28,896) | (34,266) | (40,280) |
| **Funds Post Dividend** | **(4,286)** | **(16,569)** | **(10,393)** |
| **Dividend Coverage Ratio** | **0.85x** | **0.52x** | **0.74x** |
| **AFFO Payout Ratio** | **117.4%** | **193.6%** | **134.8%** |

Source: Wolfpack Analysis

82.     In addition, the Wolfpack Report claims that it learned from a confidential source that CTO's "C-Suite and Board Were Challenged on Their Use of AFFO," but that "[m]anagement apparently brushed off these concerns because nothing has changed." Wolfpack states that the reason CTO is willing to keep misleading retail investors with respect to AFFO is "that it needs dilution to pay its dividends."

83.     Finally, Wolfpack predicted imminent further dilution of the Company, noting that CTO has just $8.4 million in cash while facing quarterly dividends of $14 million and average recurring capital expenditures of $5.7 million per quarter, along with approximately $12 million in additional planned capital expenditures.

84.     On this news, CTO's stock price fell $0.98 per share, or 5.42%, to close at $17.10 per share on June 25, 2025.

85.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

86.     During the Class Period, Defendants had both the motive and opportunity to commit fraud. For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to

maintain artificially inflated prices for CTO's securities, Defendants Albright and Partridge enriched themselves by engaging in insider sales of the Company's shares while those shares traded at artificially high prices. Specifically, during the Class Period, Defendant Albright sold at least 169,305 shares of CTO stock for total proceeds of nearly $5 million and Defendant Partridge sold at least 25,392 shares of CTO stock for total proceeds of at least $511,606.

87.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

88.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CTO securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

89.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CTO securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CTO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

90.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

91.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

92.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CTO;

- whether the Individual Defendants caused CTO to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of CTO securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

93.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

94.    Plaintiffs will rely, in part, upon the presumption of reliance

established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- CTO securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold CTO securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

95.    Based upon the foregoing, Plaintiffs and the members of the Class are

entitled to a presumption of reliance upon the integrity of the market.

96.    Alternatively, Plaintiffs and the members of the Class are entitled to

the presumption of reliance established by the Supreme Court in *Affiliated Ute*

*Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972),

as Defendants omitted material information in their Class Period statements in

violation of a duty to disclose such information, as detailed above.

## COUNT I
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

97.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

98.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

99.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CTO securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire CTO securities and options at artificially inflated prices.  In furtherance of this unlawful scheme,

43

plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

100.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CTO securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CTO's finances and business prospects.

101.    By virtue of their positions at CTO, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

44

102.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of CTO, the Individual Defendants had knowledge of the details of CTO's internal affairs.

103.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CTO.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CTO's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CTO securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning CTO's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired CTO securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

104.   During the Class Period, CTO securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CTO securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of CTO securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of CTO securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

105.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

106.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities

during the Class Period, upon the disclosure that the Company had been

disseminating misrepresented financial statements to the investing public.

### COUNT II
### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

107.   Plaintiffs repeat and re-allege each and every allegation contained in

the foregoing paragraphs as if fully set forth herein.

108.   During the Class Period, the Individual Defendants participated in the

operation and management of CTO, and conducted and participated, directly and

indirectly, in the conduct of CTO's business affairs.  Because of their senior

positions, they knew the adverse non-public information about CTO's

misstatement of income and expenses and false financial statements.

109.   As officers and/or directors of a publicly owned company, the

Individual Defendants had a duty to disseminate accurate and truthful information

with respect to CTO's financial condition and results of operations, and to correct

promptly any public statements issued by CTO which had become materially false

or misleading.

110.   Because of their positions of control and authority as senior officers,

the Individual Defendants were able to, and did, control the contents of the various

reports, press releases and public filings which CTO disseminated in the

marketplace during the Class Period concerning CTO's results of operations.

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CTO to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of CTO within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CTO securities.

111.   Each of the Individual Defendants, therefore, acted as a controlling person of CTO.  By reason of their senior management positions and/or being directors of CTO, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CTO to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of CTO and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

112.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CTO.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class

action under Rule 23 of the Federal Rules of Civil Procedure, and certifying

Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the

Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment

and post-judgment interest, as well as their reasonable attorneys' fees, expert fees

and other costs; and

D.      Awarding such other and further relief as this Court may deem just

and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 8, 2025                    Respectfully submitted,

                                         **MILLER SHAH LLP**

                                         By: */s/ Nathan C. Zipperian*
                                         Nathan C. Zipperian
                                         Jayne A. Goldstein
                                         2103 N. Commerce Parkway
                                         Fort Lauderdale, Florida 33326
                                         Telephone: (954) 515-0123
                                         nczipperian@millershah.com
                                         jagoldstein@millershah.com

POMERANTZ LLP
Jeremy A. Lieberman (*Lead Counsel*)
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiffs*