**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| CHARLES J. O'CONNOR, JR. and JUDY A. O'CONNOR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CTO REALTY GROWTH, INC., JOHN P. ALBRIGHT, MATTHEW M. PARTRIDGE, LISA M. VORAKOUN, and PHILIP R. MAYS,<br><br>Defendants. | **Case No. 6:25-cv-1516-AGM-DCI**<br><br>**HON. ANNE-LEIGH GAYLORD MOE**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Co-Lead Plaintiffs Charles J. O'Connor, Jr., Judy A. O'Connor, and Steven Sramowicz (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC")

filings, wire and press releases published by and regarding CTO Realty Growth, Inc. ("CTO" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired CTO securities between February 18, 2021 and June 24, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. CTO is a publicly traded real estate investment trust ("REIT") that owns and operates a portfolio of purported high-quality, retail-based properties located primarily in higher-growth markets in the U.S. The Company converted into a REIT in February 2021 and, as of December 31, 2024, owned 23 income properties in seven states.

3. U.S. Generally Accepted Accounting Principles ("GAAP") requires REITs to depreciate their investment properties over time using historical-cost

methods. This standard depreciation is often inaccurate when calculating a REIT's true operating value, as the underlying investment properties frequently increase in value over time.

4. To address this artificial distortion in standard GAAP net income, the National Association of Real Estate Investment Trusts ("Nareit"), a global trade association for REITs, created supplemental, non-GAAP measures, including Funds From Operations ("FFO") and Adjusted Funds From Operations ("AFFO").

5. While FFO addresses the GAAP depreciation issue, real estate analysts and investors recognize that it still does not provide the most accurate estimate of a REIT's earnings potential. This is because all REITs face recurring capital expenditures ("CapEx")—such as painting projects, roof replacements, tenant improvement allowances, or leasing commissions—which are necessary to maintain properties and the revenue stream. These are real costs that deplete a REIT's cash flow but may be capitalized and amortized under GAAP, obscuring the actual recurring expenses.

6. Accordingly, AFFO, which does include such adjustments, is seen as a better predictor of a REIT's ability to continue or grow its dividends. Therefore, AFFO is a crucial operating metric for REITs and REIT investors to compare the performance of one REIT against another.

7. Nareit and investor resource sites such as Investopedia and Investing.com define the commonly accepted definition of AFFO as:

**FFO – Normalized Recurring Capital Expenditures – Straight-Line Rent Adjustments**[1]

8. The commonly accepted definition of AFFO is widely seen as a more rigorous and accurate estimate of a REIT's true distributable cash flow because it deducts these recurring costs, which are essential for property upkeep. The REIT sector has widely adopted AFFO, which has gained significant acceptance and endorsement from leading financial institutions, making it a critical metric for investment analysis.

9. However, despite the commonly accepted definition of AFFO and the established industry practice of CTO's self-identified peer group, throughout the Class Period, Defendants artificially inflated CTO's AFFO by not subtracting CapEx. This allowed Defendants to falsely portray CTO's AFFO as being materially higher than it actually was.

10. Defendants further misled investors by comparing CTO's operating metrics, including AFFO, to other REITs that CTO identified as peers and by

---

[1] Nareit definition of AFFO, available at https://www.reit.com/glossary/adjusted-funds-operations-affo; Chen, James, *Funds From Operations (FFO): Essential for Evaluating REIT Performance*, INVESTOPEDIA, https://www.investopedia.com/terms/f/fundsfromoperation.asp #:~:text=Real%20 estate%20analysts%20are%20increasingly,of%20a%20REIT%27s%20 earnings%20potential. (last visited November 11, 2025); Gurung, Malvika, *Adjusted Funds from Operations (AFFO): What Is It, Calculation, Applications & More*, INVESTING.COM, https://www.investing.com/academy/analysis/affo-definition/ (last visited November 11, 2025).

claiming that their published AFFO was suitable for such comparison. Defendants utilized this ploy to compare CTO's AFFO favorably against peers who had correctly reported AFFO by subtracting CapEx.

11. Throughout the Class Period, Individual Defendants had a personal financial motive to artificially inflate AFFO because 50% of their cash bonus was tied to CTO's AFFO. The higher the AFFO, the larger the bonus that the Individual Defendants received.

12. Likewise, CTO had the financial motivation to manipulate its AFFO to entice investors to invest more in CTO because the Company needed new investments to cover its inflated dividend.

13. Defendants' ruse was exposed on June 25, 2025, when Wolfpack Research ("Wolfpack") published a report entitled "CTO: The B. Riley of REITs" (the "Wolfpack Report" or the "Report"), which likened CTO to B. Riley, a financial services company that recently lost more than 90% of its value amid three years of losses, soured investments, delayed financial reports and revelations that the SEC had been investigating whether the firm gave shareholders an accurate picture of its health. Citing interviews with former employees and whistleblowers, the Wolfpack Report accused CTO of employing a "manipulative definition of [AFFO] where they exclude recurring capex, unlike *all* of their self-identified shopping center REIT peers."

14. Defendants never published a response to the Wolfpack Report, and they never addressed it at the subsequent investor call on July 30, 2025, even though they had ample opportunity to do so, apparently conceding the allegations.

15. On this news, CTO's stock price fell $0.98 per share, or 5.42%, to close at $17.10 per share on June 25, 2025.

16. As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered substantial losses and damages.

## **JURISDICTION AND VENUE**

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). CTO is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

20. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21. Plaintiff, Charles J. O'Connor, Jr., acquired CTO securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. (ECF No. 12-4).

22. Plaintiff, Judy A. O'Connor, acquired CTO securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. (ECF No. 12-4).

23. Plaintiff, Steven Sramowicz, acquired CTO securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. (ECF No. 13-3).

24. Defendant CTO is a Maryland corporation with principal executive offices located at 369 N. New York Avenue, Suite 201, Winter Park, Florida 32789. The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "CTO".

25. Defendant John P. Albright ("Albright") has served as CTO's President and Chief Executive Officer at all relevant times. As President and CEO, Albright had responsibility for and ultimate authority over CTO's business, including the calculation of AFFO and other U.S. GAAP and non-U.S. GAAP measures.

26. Defendant Matthew M. Partridge ("Partridge") served as CTO's Senior Vice President ("SVP"), Chief Financial Officer ("CFO"), and Treasurer from prior to the start of the Class Period to April 2024. Throughout the Class Period, Defendant Partridge touted CTO's AFFO and compared it favorably against CTO-selected peers, despite knowing that CTO's AFFO was artificially inflated. Wolfpack Research reported that a confidential source said Partridge resigned from CTO after its officers and the board were challenged about the misleading manner in which Defendants presented AFFO to investors. On February 28, 2024, CTO confirmed that Partridge was resigning effective April 1, 2024.

27. Defendant Lisa M. Vorakoun ("Vorakoun") has served as CTO's Chief Accounting Officer at all relevant times and served as CTO's Interim CFO and Treasurer from April 2024 to June 2024.

28. Defendant Philip R. Mays ("Mays") has served as CTO's SVP, CFO, and Treasurer since June 2024.

29. Defendants Albright, Partridge, Vorakoun, and Mays are collectively referred to herein as the "Individual Defendants."

30. The Individual Defendants possessed the power and authority to control the contents of CTO's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of CTO's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance

and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with CTO, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

31. CTO and the Individual Defendants are collectively referred to herein as "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **A. REIT Basics and the Commonly Accepted Definition of AFFO**

32. A REIT, or real estate investment trust, is a company that owns, operates or finances income-producing real estate. Modeled after mutual funds, REITs historically have provided investors with regular income streams, diversification, and long-term capital appreciation. Most REITs are public companies that trade on major stock exchanges.

33. REITs allow anyone to invest in portfolios of real estate assets the same way they invest in other industries—through the purchase of stock on an exchange. REIT stockholders earn a share of the income produced—without having to go out and buy, manage, or finance property themselves.

34. REITS historically have delivered high, steady dividend income, long-term capital appreciation, and low correlation with other assets.

35. Most REITs operate along a straightforward and easily understandable business model: By leasing space and collecting rent from tenants, they generate income, which is then paid out to shareholders in the form of dividends. REITs must pay out at least 90% of their taxable income to shareholders—and most pay out 100%. If certain tests are met, REIT income is not taxed at the entity level. However, shareholders are taxed for dividends received.

36. CTO is a publicly traded REIT that owns and operates a portfolio of purported high-quality, retail properties located primarily in the high-growth Sun Belt region.

37. Like any other public company, REITs are required to report financial results periodically in conformance with GAAP, including the GAAP requirement to depreciate investment properties over time using standard methods. However, because the investment properties held by REITs usually increase, not decrease, in value over time after considering recurring capital expenditures, REIT investors typically do not find GAAP financial results sufficient to assess a REIT's prospects or performance.

38. Nareit is a trade association that serves as the worldwide representative for its member REITs and, among other things, provides industry research and guidance via white papers setting out industry standards.

39. In 1991, Nareit created a supplemental measure to assess a REIT's operating performance more accurately, primarily since standard GAAP metrics did not provide a full picture of the REIT's financial health[2]. The non-GAAP metric created by Nareit is called FFO.

40. Nareit created FFO to provide a uniform, widely accepted, supplemental industry-wide standard measure of equity REIT operating performance, which addressed the limitations associated with the measurement of net income in accordance with GAAP. The main reason for FFO was to address the artificial nature of historical-cost depreciation and amortization of real estate required by GAAP.

41. Nareit published its FFO standard in a white paper in 1991 and it has since restated and clarified the definition of FFO in 1995, 1999, and 2002. In December 2018, Nareit further restated the FFO White Paper to clarify existing guidance (the "White Paper").

[2] Nareit Funds From Operations White Paper – 2018 Restatement, available at https://www.reit.com/sites/default/files/2018-FFO-white-paper-%2811-27-18%29.pdf

42. According to Nareit's White Paper, the definition of FFO is as follows: Net income (calculated in accordance with GAAP) minus (a) depreciation and amortization to real estate; (b) gains and losses from the sale of certain real estate assets; (c) gains and losses from change in control; and (d) impairment write-down of certain real estate assets and investments in entities when the impairment is directly attributable to decreases in the value of depreciable real estate held by the entity.

43. In 2003, the SEC's Regulation G became effective and required all public companies to disclose non-GAAP measures to present, with equal or greater prominence, the most directly comparable GAAP measure and to reconcile the two.

44. The vast majority of public REITs measure FFO in accordance with Nareit's definition, including CTO. For example, in its Form 10-K filed with the SEC for the reporting year ended December 31, 2024, CTO stated that: "We compute FFO in accordance with the definition adopted by the Board of Governors of the National Association of Real Estate Investment Trusts, or NAREIT." CTO has maintained throughout the Class Period that it calculated FFO in accordance with Nareit's definition.

45. However, FFO alone is also insufficient because it does not show the complete picture of recurring expenses. As a result, real estate analysts also consider

a REIT's AFFO. This calculation takes a REIT's FFO and subtracts CapEx and any straight-line rent adjustments.

46. Investors and analysts see AFFO as a more accurate estimate of a REIT's earnings potential since it subtracts CapEx, costs that every REIT faces in any given period due to the upkeep required by its real estate holdings.

47. The REIT sector, commentators and investors have widely adopted AFFO. For example, leading financial resource websites such as Investopedia and Investing.com adopted the commonly accepted definition of AFFO, including the requirement that recurring capital expenses be deducted[3]:

**Adjusted Funds From Operations**

**=**

**Funds From Operations (FFO) – Recurring Capital Expenditures – Straight-line Rent Adjustment**

Investing.com

48. Nareit also defines the commonly accepted definition of AFFO as FFO minus "(a) normalized recurring expenditures that are capitalized by the REIT and

[3] Chen, James, *Funds From Operations (FFO): Essential for Evaluating REIT Performance*, INVESTOPEDIA, https://www.investopedia.com/terms/f/fundsfromoperation.asp#:~:text=Real%20estate%20analysts%20are%20increasingly,of%20a%20REIT%27s%20earnings%20potential. (last visited November 11, 2025); Gurung, Malvika, *Adjusted Funds from Operations (AFFO): What Is It, Calculation, Applications & More*, INVESTING.COM, https://www.investing.com/academy/analysis/affo-definition/ (last visited November 11, 2025).

then amortized, but which are necessary to maintain a REIT's properties and its revenue stream (e.g., new carpeting and drapes in apartment units, leasing expenses and tenant improvement allowances) and (b) the adjustment to GAAP revenue to 'straight-line' rents."[4]

**B. CTO's Peers Correctly Reconcile to AFFO**

49. As set forth herein, CTO encouraged investors to consider AFFO because it allowed comparison between CTO and its peers. But other public REITs that CTO identified as its peers throughout the Class Period correctly calculated AFFO by subtracting CapEx, such as capital expenditures, tenant improvements, and leasing commissions. CTO's peers that followed the commonly accepted definition of AFFO included: (i) City Office REIT, Inc., (ii) Kimco Realty Corp., (iii) Regency Centers Corporation, (iv) Acadia Realty Trust, (v) American Assets Trust, Inc., (vi) Kite Realty Trust Group, (vii) SKT (Tanger Inc.), and (viii) Plymouth Industrial REIT, Inc. (collectively, the "Peer Group").

50. For example, City Office REIT, Inc. specifically removes "net recurring capital expenditures," "net recurring leasing commissions," and "net recurring tenant improvements and incentives" when it reconciles to AFFO[5]:

---

[4] Nareit definition of AFFO, available at https://www.reit.com/glossary/adjusted-funds-operations-affo

[5] City Office REIT, Inc., *Second Quarter 2025 – Supplemental Financial Information*, available at https://s2.q4cdn.com/411446491/files/doc_financials/2025/sr/Q2-2025-Supplemental-Accounting-Package.pdf

| | | | | | |
|---|---|---|---|---|---|
| **Funds from Operations ("FFO")** | **$ 10,921** | **$ 11,433** | **$ 10,633** | **$ 9,987** | **$ 10,414** |
| (+) Stock based compensation | 844 | 914 | 1,084 | 1,084 | 1,084 |
| **Core FFO** | **$ 11,765** | **$ 12,347** | **$ 11,717** | **$ 11,071** | **$ 11,498** |
| (+/-) Net recurring straight-line rent/expense adjustment | 395 | 50 | (10) | 219 | 487 |
| (+/-) Net amortization of above and below market leases | 34 | (3) | (26) | (32) | (38) |
| (+) Net amortization of def financing costs & debt fair value | 378 | 352 | 351 | 367 | 341 |
| (-) Net recurring tenant improvements and incentives | (3,304) | (2,918) | (1,701) | (2,815) | (2,998) |
| (-) Net recurring leasing commissions | (4,995) | (1,539) | (3,203) | (1,421) | (1,722) |
| (-) Net recurring capital expenditures | (1,303) | (1,793) | (2,854) | (2,591) | (2,275) |
| **Adjusted Funds from Operations ("AFFO")** | **$ 2,970** | **$ 6,496** | **$ 4,274** | **$ 4,798** | **$ 5,293** |

51. Likewise, Kimco Realty Corp. subtracts CapEx when it reconciles to AFFO[6]:

## Non-GAAP Measure: Funds Available for Distribution (FAD)

(unaudited, in thousands, except per share data)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| **FFO available to the company's common shareholders (1)** | $ 300,316 | $ 287,388 | $ 899,767 | $ 825,175 |
| Adjustments: | | | | |
| Capital Expenditures from Operating Properties (2) (3): | | | | |
| Capitalized Building Improvements | (36,932) | (27,625) | (64,129) | (58,186) |
| Tenant Improvements and Allowances | (33,757) | (46,495) | (119,193) | (118,257) |
| External Leasing Commissions | (8,094) | (9,299) | (23,825) | (24,852) |

52. Regency Centers Corporation, another CTO peer, also subtracts CapEx when reconciling to AFFO[7]:

| **Reconciliation of Core Operating Earnings to AFFO:** | | | | |
|---|---|---|---|---|
| Core Operating Earnings | $ 202,610 | 187,763 | $ 604,278 | 570,084 |
| Adjustments to reconcile to AFFO (1): | | | | |
| Operating capital expenditures | (33,832) | (36,430) | (90,109) | (91,168) |
| Debt cost and derivative adjustments | 2,423 | 2,107 | 6,849 | 6,269 |
| Stock-based compensation | 5,321 | 4,776 | 16,219 | 14,078 |
| **AFFO** | $ 176,522 | 158,216 | $ 537,237 | 499,263 |

---

[6] Kimco Realty Corp., *Supplemental Q3 2025 Financial Information – Quarter Ended September 30, 2025*, available at https://s1.q4cdn.com/944058265/files/doc_financials/2025/q3/3Q_2025_Quarterly_Supplemental-linked.pdf

[7] Regency Centers Corporation, *Quarterly Supplemental Disclosure – 3rd Quarter 2025*, available at https://investors.regencycenters.com/static-files/588618a0-ef3f-43f2-94af-1a110d89f3a3

53. CTO, although it compared its financial prospects to the Peer Group, manipulated its calculation of AFFO in a manner that materially deviated from the commonly accepted definition of AFFO and directly contradicted the manner in which the Peer Group presented its respective AFFO.

54. Throughout the Class Period, CTO never subtracted CapEx when reconciling to AFFO. CTO's calculation deviation led to materially higher AFFO than the Peer Group, and a misleading comparison between CTO and its competitors. For example, in its supplemental financial disclosures for the year ended 2021, CTO did not account for CapEx when calculating AFFO:

| | Three Months Ended | | Year |
|---|---|---|---|
| | December 31, 2021 | December 31, 2020 | December 31, 2021 |
| Net Income Attributable to the Company | $ 1,932 | $ 79,682 | $ 29,940 |
| Depreciation and Amortization | 5,153 | 4,729 | 20,581 |
| Gains on Disposition of Assets | (210) | (2,381) | (28,316) |
| Losses (Gains) on the Disposition of Other Assets | (1,375) | (60) | (4,924) |
| Impairment Charges, Net | 809 | 7,242 | 13,283 |
| Unrealized (Gain) Loss on Investment Securities | (3,446) | 1,142 | (10,340) |
| Income Tax Expense (Benefit) from Non-FFO Items and De-Recognition of REIT Deferred Tax Assets and Liabilities | 1,840 | (80,225) | 1,840 |
| Funds from Operations | 4,703 | 10,129 | 22,064 |
| Distributions to Preferred Stockholders | (1,196) | — | (2,325) |
| Funds from Operations Attributable to Common Stockholders | 3,507 | 10,129 | 19,739 |
| Loss (Gain) on Extinguishment of Debt | 2,790 | — | 3,431 |
| Core Funds from Operations Attributable to Common Stockholders | 6,297 | 10,129 | 23,170 |
| Adjustments: | | | |
| Straight-Line Rent Adjustment | (599) | (754) | (2,443) |
| COVID-19 Rent Repayments (Deferrals), Net | 104 | 363 | 842 |
| Amortization of Intangibles to Lease Income | 416 | (402) | (404) |
| Other Non-Cash Amortization | (149) | (229) | (676) |
| Amortization of Loan Costs and Discount on Convertible Debt | 469 | 428 | 1,864 |
| Non-Cash Compensation | 734 | 651 | 3,168 |
| Non-Recurring G&A | — | 371 | 155 |
| Adjusted Funds from Operations Attributable to Common Stockholders | $ 7,272 | $ 10,557 | $ 25,676 |
| FFO per Common Share – Diluted | $ 0.60 | $ 2.11 | $ 3.35 |
| Core FFO per Common Share – Diluted | $ 1.07 | $ 2.11 | $ 3.93 |
| AFFO per Common Share – Diluted | $ 1.23 | $ 2.20 | $ 4.36 |

55. Throughout the Class Period, CTO did not include the following amounts of CapEx in its AFFO calculation:

| Reporting Year | CapEx Amount |
|---|---|
| 2022 | $9,315,000 |
| 2023 | $25,376,000 |
| 2024 | $20,886,000 |

56. Due to the fact that CTO did not subtract CapEx when reconciling to AFFO, its AFFO was materially higher than the Peer Group. As calculated by market researcher Wolfpack, CTO's AFFO was materially inflated when compared to the industry standard:

| Wolfpack Estimate of CTO's True AFFO | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| Per Industry Standards | | | |
| **Reported AFFO** | **33,925** | **43,073** | **50,773** |
| (-) Leasing Capital Expenses | | | |
| (-) Capital Expenditures and Other Capital Investments | n.a. | (8,925) | (6,163) |
| (-) Tenant Improvement Allowances | (7,141) | (14,101) | (11,095) |
| (-) Leasing Commissions | (2,174) | (2,350) | (3,628) |
| **Industry Standard AFFO** | **24,610** | **17,697** | **29,887** |
| (-) Dividends Paid - Common Stock | (28,896) | (34,266) | (40,280) |
| **Funds Post Dividend** | **(4,286)** | **(16,569)** | **(10,393)** |
| **Dividend Coverage Ratio** | **0.85x** | **0.52x** | **0.74x** |
| **AFFO Payout Ratio** | **117.4%** | **193.6%** | **134.8%** |

**Source:** Wolfpack Analysis

57. Furthermore, according to Wolfpack, CTO's AFFO was 5.5% higher than its FFO, when the Peer Group's average AFFO was 26% lower than the average FFO, due to the Peer Group taking into account CapEx:

**Peer FFO-AFFO Variance Analysis**

| Peer | FY 2024 FFO | FY 2024 AFFO | Variance |
|---|---|---|---|
| KIM (Kimco Realty Inc) | 1,112,076 | 814,548 | *(26.8%)* |
| AHH (Armada Hoffler Properties Inc) | 118,893 | 86,274 | *(27.4%)* |
| CIO (City Office REIT Inc) | 43,506 | 23,440 | *(46.1%)* |
| REG (Regency Centers Corp) | 790,892 | 649,373 | *(17.9%)* |
| KRG (Kite Realty Group Trust) | 455,834 | 327,198 | *(28.2%)* |
| AKR (Acadia Realty Trust) | 148,976 | 134,511 | *(9.7%)* |
| *Peer Average* | *311,620* | *244,159* | *(26.0%)* |
| **CTO (CTO Realty Growth Inc)** | **48,129** | **50,773** | ***5.5%*** |

**Source:** Wolfpack Analysis

58. CTO's distorted calculation of AFFO was material and rendered any comparison to the Peer Group misleading.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

59. The Class Period begins on February 18, 2021, when CTO touted its "***attractive and sustainable dividend***"[8] and a strong increase in AFFO:

| (in thousands, except for per share data) | | For the Year Ended December 31, 2020 | | For the Year Ended December 31, 2019 | *Variance to Comparable Period in the Prior Year* | |
|---|---|---|---|---|---|---|
| Net Income | $ | 78,509 | $ | 114,973 | *$ (36,464)* | *(31.7%)* |
| Net Income per diluted share | $ | 16.69 | $ | 23.00 | *$ (6.31)* | *(27.4%)* |
| FFO (1) | $ | 27,468 | $ | 14,224 | *$ 13,244* | *93.1%* |
| FFO per diluted share (1) | $ | 5.84 | $ | 2.85 | *$ 2.99* | *104.9%* |
| AFFO (1) | $ | 26,215 | $ | 14,819 | *$ 11,396* | *76.9%* |
| AFFO per diluted share (1) | $ | 5.57 | $ | 2.97 | *$ 2.60* | *87.5%* |
| Dividends Declared and Paid, per share | $ | 13.88 (2) | $ | 0.44 | *$ 13.44* | *3,054.5%* |

[8] All emphases included herein are added unless otherwise indicated.

60. The statements identified in Paragraph 59 above were materially false and/or misleading when made because: (i) CTO was artificially inflating its AFFO by not subtracting CapEx as mandated by the commonly accepted definition published by Nariet, Investopedia, and Investing.com, and as followed by REIT sector participants, including the Peer Group; and (ii) the sustainability of the Company's dividend was undermined by the CapEx that CTO excluded from the AFFO calculation.

61. Furthermore, in explaining non-GAAP measures, CTO assured investors that:

> Our reported results are presented in accordance with GAAP. We also disclose Funds From Operations ("FFO") and Adjusted Funds From Operations ("AFFO"), both of which are non-GAAP financial measures. We believe ***these two non-GAAP financial measures are useful to investors because they are widely accepted industry measures used by analysts and investors to compare the operating performance of REITs.***

62. The statements identified in Paragraph 61 above were materially false and/or misleading when made because: (i) CTO manipulated the commonly accepted definition of AFFO published by Nariet, Investopedia, and Investing.com, and followed by the Peer Group, which required that a REIT subtract CapEx when reconciling to AFFO; and (ii) as a result of CTO's manipulation of AFFO, investors could not use CTO's published AFFO to accurately compare the Company's performance to the "operating performance of REITs" including the Peer Group.

63. On February 19, 2021, CTO hosted an earnings call with investors and analysts to discuss the Company's Q4 and full year 2020 results (the "Q4 2020 Earnings Call"). During the Q4 2020 Earnings Call, Defendant Patridge stated, in relevant part:

> For January, we are excited to announce we have collected 99% of contractual dates rents due and payable. In consideration of our reconversion, we will now be reporting funds from operations or FFO, and adjusted funds from operations ***or AFFO, as it is standard in the industry***.
>
> For the fourth quarter of 2020, funds from operations were $10.1 million or $2.11 per diluted share. This represents a 174% year-over-year increase from the fourth quarter of 2019. ***Adjusted funds from operations for the fourth quarter of 2020 were $10.6 million or $2.20 per diluted share***, and this represents a 210% year-over-year increase from the fourth quarter of 2019.
>
> ***
>
> I would like to note that we expect our dividend payout ratios relative to AFFO to be in a range of 90% to 100% annually. ***This is a higher ratio than most other REITS and it's a product of our low taxable depreciation, which increases our overall taxable income and must be paid out in order to maintain our REIT status***.

64. The statements identified in Paragraph 63 above were materially false and/or misleading when made because: (i) CTO manipulated the commonly accepted definition of AFFO published by Nariet, Investopedia, and Investing.com, and followed by the Peer Group, which required that a REIT subtract CapEx when reconciling to AFFO; (ii) AFFO "for the fourth quarter of 2020" was artificially inflated to "$10.6 million" because it did not account for the Company's CapEx; (iii)

CTO's AFFO was not "higher [] than most other REITs", including the Peer Group, when calculated using the same manner; and (iv) as a result of CTO's manipulation of AFFO, it could not be compared to "most other REITs", including the Peer Group, because the Company did not subtract CapEx when calculating AFFO.

65. During the scripted portion of the Q4 2020 Earnings Call, Defendant Albright stated, in relevant part:

> Our transition to a REIT has been a long and winding process. But we believe that benefits of the structure for shareholders now and in the future are numerous. With our REIT election, we've instituted a regular quarterly cash dividend that allows us to effectively pass along the income of the company to our shareholders. ***Additionally, our REIT status now allows us to be more appropriately compared to other companies owning and managing similar real estate investments. And as you saw with our earnings release and supplemental financial report yesterday, has served as a catalyst for improved financial reporting that we hope will drive a more comparable valuation to our new peers.***

66. The statements identified in Paragraph 65 above were materially false and/or misleading when made because: (i) CTO's irregular calculation of AFFO did not allow investors to "appropriately compare[] [CTO] to other companies owning and managing similar real estate investments"; and (ii) CTO's financial reporting was not "improved".

67. On March 5, 2021, CTO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K"). In discussing non-GAAP financial measures

the Company uses to present its financial results, the 2020 10-K stated, in relevant part:

> Our reported results are presented in accordance with GAAP. We also disclose Funds From Operations ("FFO") and Adjusted Funds From Operations ("AFFO"), both of which are non-GAAP financial measures. ***We believe these two non-GAAP financial measures are useful to investors because they are widely accepted industry measures used by analysts and investors to compare the operating performance of REITs***.
>
> ***
>
> To derive AFFO, we modify the NAREIT computation of FFO to include other adjustments to GAAP net income related to non-cash revenues and expenses such as straight-line rental revenue, amortization of deferred financing costs, amortization of capitalized lease incentives and above- and below-market lease related intangibles, and non-cash compensation. Such items may cause short-term fluctuations in net income but have no impact on operating cash flows or long-term operating performance. We use AFFO as one measure of our performance when we formulate corporate goals.
>
> ***
>
> We believe that AFFO is an additional useful supplemental measure for investors to consider ***because it will help them to better assess our operating performance without the distortions created by other non-cash revenues or expenses***.

68. The statements identified in Paragraph 67 above were materially false and/or misleading when made because: (i) CTO's calculation of AFFO manipulated the commonly accepted definition of AFFO published by Nariet, Investopedia, and Investing.com and followed by the Peer Group, as CTO did not subtract CapEx; (ii) investors could not use CTO's AFFO to accurately compare the Company's

performance to "operating performance of REITs" including the Peer Group; and (iii) as a result of CTO's manipulation of AFFO, it did not "help [investors] to better assess [CTO's] operating performance", it misled them.

69. Appended to the 2020 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Albright and Partridge attesting that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

70. The statements identified in Paragraph 69 above were materially false and/or misleading when made because CTO's calculation of AFFO did "not fairly present[], in all material respects, the financial condition and results of operations of the Company."

71. On April 29, 2021, CTO issued a press release announcing the Company's financial and operational results for Q1 2021. The press release stated, in relevant part:

> Reported FFO and AFFO per diluted share of $0.89 and $0.97, respectively, for the quarter ended March 31, 2021.
>
> ***
>
> *Non-GAAP Financial Measures*
>
> Our reported results are presented in accordance with GAAP. We also disclose Funds From Operations ("FFO") and Adjusted Funds From Operations ("AFFO"), both of which are non-GAAP financial

> measures. We believe these two non-GAAP financial measures are ***useful to investors because they are widely accepted industry measures used by analysts and investors to compare the operating performance of REITs***.

***

| (in thousands, except per share data) | For the Three Months Ended March 31, 2021 | For the Three Months Ended March 31, 2020 | *Variance to Comparable Period in the Prior Year* | |
|---|---|---|---|---|
| Net Income (Loss) | $ 7,785 | $ (12,262) | *$ 20,047* | *163.5%* |
| Net Income (Loss) per diluted share | $ 1.32 | $ (2.60) | *$ 3.92* | *150.8%* |
| FFO [1] | $ 5,246 | $ 9,290 | *$ (4,044)* | *(43.5%)* |
| FFO per diluted share [1] | $ 0.89 | $ 1.97 | *$ (1.08)* | *(54.8%)* |
| AFFO [1] | $ 5,687 | $ 9,182 | *$ (3,495)* | *(38.1%)* |
| AFFO per diluted share [1] | $ 0.97 | $ 1.95 | *$ (0.98)* | *(50.3%)* |
| Dividends Declared and Paid, per share | $ 1.00 | $ 0.25 | *$ 0.75* | *300.0%* |

72. The statements identified in Paragraph 71 above were materially false and/or misleading when made because: (i) they omitted that CTO's calculation of AFFO was artificially inflated by not subtracting CapEx; (ii) and as such, CTO's calculation of AFFO manipulated the commonly accepted definition of AFFO published by Nariet, Investopedia, and Investing.com and followed by the Peer Group; and (iii) as a result of CTO's manipulation of AFFO, investors could not use CTO's AFFO to accurately compare the Company's performance to "operating performance of REITs" including the Peer Group.

73. On February 24, 2022, CTO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K"). In discussing non-GAAP financial measures

the Company uses to present its financial results, the 2021 10-K stated, in relevant part:

> Our reported results are presented in accordance with GAAP. We also disclose Funds From Operations ("FFO"), Core Funds From Operations ("Core FFO"), and Adjusted Funds From Operations ("AFFO"), each of which are non-U.S. GAAP financial measures. ***We believe these non-U.S. GAAP financial measures are useful to investors because they are widely accepted industry measures used by analysts and investors to compare the operating performance of REITs***.
>
> ***
>
> We compute FFO in accordance with the definition adopted by the Board of Governors of the National Association of Real Estate Investment Trusts, or NAREIT. NAREIT defines FFO as U.S. GAAP net income or loss adjusted to exclude extraordinary items (as defined by U.S. GAAP), net gain or loss from sales of depreciable real estate assets, impairment write-downs associated with depreciable real estate assets and real estate related depreciation and amortization, including the pro rata share of such adjustments of unconsolidated subsidiaries. The Company also excludes the gains or losses from sales of assets incidental to the primary business of the REIT which specifically include the sales of mitigation credits, impact fee credits, subsurface sales, and land sales. To derive Core FFO, we modify the NAREIT computation of FFO to include other adjustments to U.S. GAAP net income related to gains and losses recognized on the extinguishment of debt. ***To derive AFFO, we further modify the NAREIT computation of FFO and Core FFO to include other adjustments to U.S. GAAP net income related to non-cash revenues and expenses such as straight-line rental revenue, amortization of above- and below-market lease related intangibles, non-cash compensation, and other non-cash amortization***. Such items may cause short-term fluctuations in net income but have no impact on operating cash flows or long-term operating performance. We use AFFO as one measure of our performance when we formulate corporate goals.
>
> ***

> We believe that Core FFO and AFFO are additional useful supplemental measures for investors to consider ***because they will help them to better assess our operating performance without the distortions created by other non-cash revenues or expenses***.

74. The statements identified in Paragraph 73 above were materially false and/or misleading when made because: (i) CTO's calculation of AFFO manipulated the commonly accepted definition of AFFO published by Nariet, Investopedia, and Investing.com, and followed by the Peer Group, as CTO did not subtract CapEx; (ii) investors could not use CTO's AFFO to accurately compare the Company's performance to the "operating performance of REITs" including the Peer Group; and (iii) as a result of CTO's manipulation of AFFO, it did not "help [investors] to better assess [CTO's] operating performance", it misled them.

75. Appended to the 2021 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Albright and Partridge attesting that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

76. The statements identified in Paragraph 75 above were materially false and/or misleading when made because: (i) CTO's calculation of AFFO did "not fairly present[], in all material respects, the financial condition and results of operations of the Company."

77. On April 29, 2022, CTO hosted an earnings call with investors and analysts to discuss the Company's Q1 2022 results (the "Q1 2022 Earnings Call"). During the scripted portion of the Q1 2022 Earnings Call, Defendant Partridge stated, in relevant part, "[o]ur quarterly dividend represents a cash payout ratio of 73% of Q1 2022 AFFO per share and we continue to work towards efficiently paying out approximately 100% of taxable income in 2022."

78. The statements identified in Paragraph 77 above were materially false and/or misleading when made because: (i) CTO's dividend based on the "payout ratio of 73% of Q1 2022 AFFO per share" was inflated because CTO did not subtract CapEx when reconciling AFFO; and (ii) as a result CTO's manipulation of AFFO, the payout ratio was materially higher than it would have been if CapEx was taken into account, see ¶¶55-58, 104.

79. On July 29, 2022, CTO hosted an earnings call with investors and analysts to discuss the Company's Q2 2022 results (the "Q2 2022 Earnings Call"). During the scripted portion of the Q2 2022 Earnings Call, Defendant Partridge stated, in relevant part:

> As previously announced, the company paid a second quarter regular cash dividend of $1.12 per share, which is a 12% year-over-year increase over the company's Q2 2021 cash dividend and a 4% increase over our Q1 2022 quarterly cash dividend and a current stock split adjusted annualized yield of approximately 7%. ***Our quarterly dividend represents a cash payout ratio of 76% of Q2 2022 AFFO per share***, and we continue to work towards efficiently paying out approximately 100% of taxable income in 2022.

80. The statements identified in Paragraph 79 above were materially false and/or misleading when made because: (i) CTO's dividend based on the "payout ratio of 76% of Q2 2022 AFFO per share" was inflated because CTO did not subtract CapEx when reconciling AFFO; and (ii) as a result CTO's manipulation of AFFO, the payout ratio was materially higher than it would have been if CapEx was taken into account, ¶¶55-58, 104.

81. During this period, analysts viewed CTO's AFFO as a positive factor and advised investors to buy CTO securities. For example, on July 29, 2022, analysts at EF Hutton reiterated their buy rating and raised their price target for CTO securities based on CTO's "strong operating performance and 2022 AFFO/sh."

82. On February 23, 2023, CTO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2022 (the "2022 10-K"). In discussing non-GAAP financial measures the Company uses to present its financial results, the 2022 10-K stated, in relevant part:

> Our reported results are presented in accordance with U.S. GAAP. We also disclose Funds From Operations ("FFO"), Core Funds From Operations ("Core FFO"), and Adjusted Funds From Operations ("AFFO"), each of which are non-U.S. GAAP financial measures. ***We believe these non-U.S. GAAP financial measures are useful to investors because they are widely accepted industry measures used by analysts and investors to compare the operating performance of REITs***.

***

> We compute FFO in accordance with the definition adopted by the Board of Governors of the National Association of Real Estate Investment Trusts, or NAREIT. NAREIT defines FFO as U.S. GAAP net income or loss adjusted to exclude extraordinary items (as defined by U.S. GAAP), net gain or loss from sales of depreciable real estate assets, impairment write-downs associated with depreciable real estate assets and real estate related depreciation and amortization, including the pro rata share of such adjustments of unconsolidated subsidiaries. The Company also excludes the gains or losses from sales of assets incidental to the primary business of the REIT which specifically include the sales of mitigation credits, impact fee credits, subsurface sales, and land sales, in addition to the mark-to-market of the Company's investment securities and interest related to the 2025 Notes, if the effect is dilutive. To derive Core FFO, we modify the NAREIT computation of FFO to include other adjustments to U.S. GAAP net income related to gains and losses recognized on the extinguishment of debt, amortization of above- and below-market lease related intangibles, and other unforecastable market- or transaction-driven non-cash items. ***To derive AFFO, we further modify the NAREIT computation of FFO and Core FFO to include other adjustments to U.S. GAAP net income related to non-cash revenues and expenses such as straight-line rental revenue, non-cash compensation, and other non-cash amortization, as well as adding back the interest related to the 2025 Notes, if the effect is dilutive***. Such items may cause short-term fluctuations in net income but have no impact on operating cash flows or long-term operating performance. We use AFFO as one measure of our performance when we formulate corporate goals.

***

> We believe that Core FFO and AFFO are additional useful supplemental measures for investors to consider ***because they will help them to better assess our operating performance without the distortions created by other non-cash revenues or expenses***.

83. The statements identified in Paragraph 82 above were materially false and/or misleading when made because: (i) CTO's calculation of AFFO manipulated

the commonly accepted definition of AFFO published by Nariet, Investopedia, and Investing.com, and followed by the Peer Group, as CTO did not subtract CapEx; (ii) investors could not use CTO's AFFO to accurately compare the Company's performance to the "operating performance of REITs" including the Peer Group; and (iii) as a result of CTO's manipulation of AFFO, it did not "help [investors] to better assess [CTO's] operating performance", it misled them.

84. Appended to the 2022 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Albright and Partridge attesting that "[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

85. The statements identified in Paragraph 84 above were materially false and/or misleading when made because: (i) CTO's calculation of AFFO did "not fairly present[], in all material respects, the financial condition and results of operations of the Company."

86. On April 28, 2023, CTO hosted an earnings call with investors and analysts to discuss the Company's Q1 2023 results (the "Q1 2023 Earnings Call"). During the scripted portion of the Q1 2023 Earnings Call, Defendant Partridge stated, in relevant part:

> Per our previous announcement in February, we paid a first quarter regular cash dividend of $0.38 per share, which is a 5.6% increase over

> our Q1 2022 cash dividend and a very attractive current annualized yield of approximately 8.8%*. **Our quarterly dividend represents a cash payout ratio of 88% of Q1, 2023 AFFO per share***, and we continue to work towards efficiently paying out approximately 100% of projected 2023 taxable income.

87. The statements identified in Paragraph 86 above were materially false and/or misleading when made because: (i) CTO's dividend based on the "payout ratio of 88% of Q1 2023 AFFO per share" was inflated because CTO did not subtract CapEx when reconciling to AFFO; and (ii) as a result CTO's manipulation of AFFO, the payout ratio was materially higher than it would have been if CapEx was taken into account, see ¶¶55-58, 104.

88. On July 28, 2023, CTO hosted an earnings call with investors and analysts to discuss the Company's Q2 2023 results (the "Q2 2023 Earnings Call"). During the scripted portion of the Q2 2023 Earnings Call, Defendant Partridge stated, in relevant part, "we distributed a second quarter regular cash dividend of $0.38 per share. This marks a 1.8% increase compared to the second quarter 2022 cash dividend resulting in a Q2 2023 AFFO payout ratio of 79% and an attractive annualized yield of approximately 8.5%."

89. The statements identified in Paragraph 88 above were materially false and/or misleading when made because: (i) CTO's dividend based on the "Q2 2023 AFFO payout ratio of 79% " was inflated because CTO did not subtract CapEx when reconciling AFFO; and (ii) as a result CTO's manipulation of AFFO, the payout

ratio was materially higher than it would have been if CapEx was taken into account, see ¶¶55-58, 104.

90. On February 22, 2024, CTO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2023 (the "2023 10-K"). In discussing non-GAAP financial measures the Company uses to present its financial results, the 2023 10-K stated, in relevant part:

> Our reported results are presented in accordance with U.S. GAAP. We also disclose Funds From Operations ("FFO"), Core Funds From Operations ("Core FFO"), and Adjusted Funds From Operations ("AFFO"), each of which are non-U.S. GAAP financial measures. ***We believe these non-U.S. GAAP financial measures are useful to investors because they are widely accepted industry measures used by analysts and investors to compare the operating performance of REITs***.
>
> ***
>
> NAREIT defines FFO as GAAP net income or loss adjusted to exclude real estate related depreciation and amortization, as well as extraordinary items (as defined by GAAP) such as net gain or loss from sales of depreciable real estate assets, impairment write-downs associated with depreciable real estate assets and impairments associated with the implementation of current expected credit losses on commercial loans and investments at the time of origination, including the pro rata share of such adjustments of unconsolidated subsidiaries. The Company also excludes the gains or losses from sales of assets incidental to the primary business of the REIT which specifically include the sales of mitigation credits, subsurface sales, investment securities, and land sales, in addition to the mark-to-market of the Company's investment securities and interest related to the 2025 Convertible Senior Notes, if the effect is dilutive. To derive Core FFO, we modify the NAREIT computation of FFO to include other

> adjustments to GAAP net income related to gains and losses recognized on the extinguishment of debt, amortization of above- and below-market lease related intangibles, and other unforecastable market- or transaction-driven non-cash items. ***To derive AFFO, we further modify the NAREIT computation of FFO and Core FFO to include other adjustments to GAAP net income related to non-cash revenues and expenses such as straight-line rental revenue, non-cash compensation, and other non-cash amortization, as well as adding back the interest related to the 2025 Convertible Senior Notes, if the effect is dilutive.*** Such items may cause short-term fluctuations in net income but have no impact on operating cash flows or long-term operating performance. We use AFFO as one measure of our performance when we formulate corporate goals.
>
> ***
>
> We believe that Core FFO and AFFO are additional useful supplemental measures for investors to consider ***because they will help them to better assess our operating performance without the distortions created by other non-cash revenues or expenses***.

91. The statements identified in Paragraph 90 above were materially false and/or misleading when made because: (i) CTO's calculation of AFFO manipulated the commonly accepted definition of AFFO published by Nariet, Investopedia, and Investing.com, and followed by the Peer Group, as CTO did not subtract CapEx; (ii) investors could not use CTO's AFFO to accurately compare the Company's performance to the "operating performance of REITs" including the Peer Group; (iii) as a result of CTO's manipulation of AFFO, it did not "help [investors] to better assess [CTO's] operating performance", it misled them.

92. Appended to the 2023 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Albright and

Partridge attesting that "[t]he information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

93. The statements identified in Paragraph 92 above were materially false and/or misleading when made because: (i) CTO's calculation of AFFO did "not fairly present[], in all material respects, the financial condition and results of operations of the Company."

94. On May 3, 2024, CTO hosted an earnings call with investors and analysts to discuss the Company's Q1 2024 results (the "Q1 2024 Earnings Call"). During the scripted portion of the Q1 2024 Earnings Call, Defendant Vorakoun stated, in relevant part, "[a]s we announced in February, we distributed a first quarter regular cash dividend of $0.38 per share resulting in a Q1 2024 AFFO payout ratio of 73% and an attractive current annualized yield of approximately 8.8%."

95. The statements identified in Paragraph 94 above were materially false and/or misleading when made because: (i) CTO's dividend based on the "Q1 2024 AFFO payout ratio of 73% " was inflated because CTO did not subtract CapEx when reconciling AFFO; and (ii) as a result CTO's manipulation of AFFO, the payout ratio was materially higher than it would have been if CapEx was taken into account, see ¶¶55-58, 104.

96. On July 26, 2024, CTO hosted an earnings call with investors and analysts to discuss the Company's Q2 2024 results (the "Q2 2024 Earnings Call"). During the scripted portion of the Q2 2024 Earnings Call, Defendant Mays stated, in relevant part:

> As we announced in May, ***we distributed a second quarter regular cash dividend of $0.38 per share resulting in a Q2 2024 AFFO payout ratio of 79% and at an attractive current annualized yield of approximately 8%***. Consistent with past practice, towards the end of August, we will announce our quarterly dividend amount for the third quarter.

97. The statements identified in Paragraph 96 above were materially false and/or misleading when made because: (i) CTO's dividend based on the "Q2 2024 AFFO payout ratio of 79% " was inflated because CTO did not subtract CapEx when reconciling AFFO; and (ii) as a result CTO's manipulation of AFFO, the payout ratio was materially higher than it would have been if CapEx was taken into account, see ¶¶55-58, 104.

98. On February 20, 2025, CTO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2024 (the "2024 10-K"). In discussing non-GAAP financial measures the Company uses to present its financial results, the 2024 10-K stated, in relevant part:

> Our reported results are presented in accordance with U.S. GAAP. We also disclose Funds From Operations ("FFO"), Core Funds From Operations ("Core FFO"), and Adjusted Funds From Operations

("AFFO"), each of which are non-U.S. GAAP financial measures. ***We believe these non-U.S. GAAP financial measures are useful to investors because they are widely accepted industry measures used by analysts and investors to compare the operating performance of REITs***.

***

NAREIT defines FFO as GAAP net income or loss adjusted to exclude real estate related depreciation and amortization, as well as extraordinary items (as defined by GAAP) such as net gain or loss from sales of depreciable real estate assets, impairment write-downs associated with depreciable real estate assets and impairments associated with the implementation of current expected credit losses on commercial loans and investments at the time of origination, including the pro rata share of such adjustments of unconsolidated subsidiaries. The Company also excludes the gains or losses from sales of assets incidental to the primary business of the REIT which specifically include the sales of mitigation credits, subsurface sales, investment securities, and land sales, in addition to the mark-to-market of the Company's investment securities and interest related to the 2025 Convertible Senior Notes, if the effect is dilutive. To derive Core FFO, we modify the NAREIT computation of FFO to include other adjustments to GAAP net income related to gains and losses recognized on the extinguishment of debt, amortization of above- and below-market lease related intangibles, and other unforecastable market- or transaction-driven non-cash items, as well as adding back the interest related to the 2025 Convertible Senior Notes, if the effect is dilutive. ***To derive AFFO, we further modify the NAREIT computation of FFO and Core FFO to include other adjustments to GAAP net income related to non-cash revenues and expenses such as straight-line rental revenue, non-cash compensation, and other non-cash amortization.*** Such items may cause short-term fluctuations in net income but have no impact on operating cash flows or long-term operating performance. We use AFFO as one measure of our performance when we formulate corporate goals.

***

> We believe that Core FFO and AFFO are additional useful supplemental measures for investors to consider ***because they will help them to better assess our operating performance without the distortions created by other non-cash revenues or expenses***.

99. The statements identified in Paragraph 98 above were materially false and/or misleading when made because: (i) CTO's calculation of AFFO manipulated the commonly accepted definition of AFFO published by Nariet, Investopedia, and Investing.com, and followed by the Peer Group, as CTO did not subtract CapEx; (ii) investors could not use CTO's AFFO to accurately compare the Company's performance to the "operating performance of REITs" including the Peer Group; and (iii) as a result of CTO's manipulation of AFFO, it did not "help [investors] to better assess [CTO's] operating performance", it misled them.

100. Appended to the 2024 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Albright and Mays attesting that "[t]he information contained in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

101. The statements identified in Paragraph 100 above were materially false and/or misleading when made because: (i) CTO's calculation of AFFO did "not fairly present[], in all material respects, the financial condition and results of operations of the Company."

## THE TRUTH EMERGES

102. On June 25, 2025, Wolfpack published a report entitled "CTO: The B. Riley of REITs". Citing interviews with former employees and whistleblowers, the Wolfpack Report accused CTO of employing a "manipulative definition of [AFFO] where they exclude recurring capex, unlike *all* of their self-identified shopping center REIT peers."

103. The Wolfpack Report extensively analyzed the Company's "manipulative definition" of AFFO in a deep comparison with other industry participants, including the Peer Group, providing information that no investor could have gleaned from CTO's public filings. The report concluded that by excluding CapEx, CTO "trick[ed] investors into hopping onto this never-ending dilution merry-go-round." The Wolfpack Report highlighted that management not only used its irregular AFFO calculation to "lure in unsuspecting investors," but also for "performance pay, inflating $8 million in bonuses we think they never should have received."

104. Wolfpack disclosed that CTO is "Obscuring the Fact that Their Core Cash Flows from Operations Have Never Been Enough to Cover Their Dividend and Pay for Recurring Capex with an AFFO Metric That Is an Aberration from Their Peers." For example, the Wolfpack Report showed the impact of properly calculating AFFO on CTO's 2024 dividend coverage, noting that while reported

AFFO of $50.7 million makes "it seem[] that the dividend is amply covered," properly including CapEx in AFFO would show that it is not:

| Total Capital Investments | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 | 2024 |
|---|---|---|---|---|---|
| Capital Expenditures and Other Capital Investments | $1,014 | $664 | $1,001 | $3,484 | $6,163 |
| Tenant Improvement Allowances | 1,281 | 2,516 | 2,709 | 4,589 | 11,095 |
| Leasing Commissions | 1,030 | 247 | 1,030 | 1,321 | 3,628 |
| Total Capital Investments | $3,325 | $3,427 | $4,740 | $9,394 | $20,886 |

Source: CTO Supplemental Investor Materials[48]

As Wolfpack assessed, "[f]actoring in this real cash expense, we calculate CTO's industry standard would have been $29.9 million, leaving a $10 million shortfall after paying common shareholders their dividend in 2024" and "when [Wolfpack] look[s] back at the last three years, [Wolfpack] can see that CTO's core cash flows from operations ***in the aggregate had a $31.2 million shortfall in covering the paid common dividends***."

| Wolfpack Estimate of CTO's True AFFO | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| Per Industry Standards | | | |
| Reported AFFO | 33,925 | 43,073 | 50,773 |
| (-) Leasing Capital Expenses | | | |
| (-) Capital Expenditures and Other Capital Investments | n.a. | (8,925) | (6,163) |
| (-) Tenant Improvement Allowances | (7,141) | (14,101) | (11,095) |
| (-) Leasing Commissions | (2,174) | (2,350) | (3,628) |
| Industry Standard AFFO | 24,610 | 17,697 | 29,887 |
| (-) Dividends Paid - Common Stock | (28,896) | (34,266) | (40,280) |
| Funds Post Dividend | (4,286) | (16,569) | (10,393) |
| Dividend Coverage Ratio | 0.85x | 0.52x | 0.74x |
| AFFO Payout Ratio | 117.4% | 193.6% | 134.8% |

Source: Wolfpack Analysis

105. Prior to the Wolfpack Report, there was no public source properly calculating CTO's AFFO for investors to reference. The truth was not on the market. The Wolfpack Report also contained additional non-public information, including the disclosure that Wolfpack learned from a confidential source that CTO's "C-Suite and Board Were Challenged on Their Use of AFFO," but that "[m]anagement apparently brushed off these concerns because nothing has changed." Wolfpack explained that the reason CTO adopted a misleading AFFO calculation is that it needed to continue selling shares, or "dilution to pay its dividends" and because management's bonus packages were heavily tied to reported AFFO.

106. On this news, CTO's stock price fell $0.98 per share, or 5.42%, to close at $17.10 per share on June 25, 2025.

107. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL ALLEGATIONS OF SCIENTER

108. *First*, Defendants' scienter is supported by the fact that the alleged misstatements and omissions concerned CTO's core business. Defendants attracted new investors by manipulating AFFO to exclude CapEx, thereby making CTO's dividends appear more attractive. Therefore, it would be absurd to infer that

Defendants were unaware of the AFFO non-GAAP reconciliation issues that plagued the Company's principal business.

109. *Second*, Defendants repeatedly held themselves out to investors, analysts, and the SEC as knowledgeable about CTO's financial performance, operations, compliance with accounting standards, financial controls, and especially the "widely accepted industry measures [including AFFO] used by analysts and investors to compare the operating performance of REITs."

110. *Third*, Defendants had access to information contradicting their public statements. For example, while touting to investors a supposed "higher [AFFO] ratio than most other REITS," Defendants had access to CTO's CapEx data that should have negatively impacted AFFO, and which rendered false their statements to investors. Similarly, while telling investors their methodology was consistent with their Peer Group, they had access to the Peer Group's financial statements that did not similarly reconcile AFFO without subtracting CapEx.

111. *Fourth*, Defendants' scienter is bolstered by unusual insider trading by Defendants during the Class Period while in possession of material non-public information. Defendants Albright and Vorakoun enriched themselves by engaging in insider sales of the Company's shares while those shares traded at artificially high prices. Specifically, during the Class Period, Defendant Albright sold at least

103,934 shares of CTO stock for total proceeds of $4,746,971, and Defendant Vorakoun sold at least 3,361 shares of CTO stock for total proceeds of $192,465.

112. *Fifth*, Defendant Partridge's resignation as CFO following questions about Defendants' misleading AFFO reporting also bolsters scienter.

113. *Sixth*, after Wolfpack issued its damning report exposing the Defendants' scheme, the Defendants did not publish a statement to rebut the accusations raised in the Wolfpack Report or address it at the subsequent investor call on July 30, 2025, apparently conceding its truth. Investors took notice of Defendants' silence in the face of the reported misconduct and also interpreted it as Defendants' admission of guilt:




***



Parrot Capital @ParrotCapital · Jun 26
Dan and his team Wolfpack Research nailed the short thesis and then some on the $RILY crime scene, so when they compare $CTO to B Riley in the same sentence, my ears certainly perk up.

Where is Realty Growth's response to this?

If you're a shareholder, wouldn't this worry you?

Wolfpack Research @WolfpackReports · 10m
$CTO has not responded to our report, but its CEO apparently has given a vote of confidence by purchasing "checks notes" a whopping 3,500 shares. All the extra dough he gets from the BS AFFO bonus and that's all he can buy?

| Company | Symbol | Insider Relationship | Shares Traded |
|---|---|---|---|
| Realty Growth Inc. | CTO | Albright John P PRESIDENT & CEO | 3,800 |

Wolfpack Research @WolfpackReports · Jun 25
We are short $CTO because we believe its dividend is unsustainable and management has deceived investors with a bullshit AFFO, a sham loan, and false and misleading statements about its tenants. It's like $CTO is aiming to be the $RILY of REITs. Our analysis shows a $38M cash

2 1 9 8.5K

114. *Seventh*, Defendants' scienter is further bolstered by the fact that Defendants had the financial motivation to inflate AFFO to receive larger bonuses, as 50% of their bonuses were tied to AFFO, according to CTO's Notice of Annual Meeting of Stockholders and 2024 Proxy Statement:

> AFFO Per Share: By the end of 2020, the Company had largely completed its primary strategic objective of monetizing its land portfolio and redeploying the proceeds into income properties, which culminated in the Company's conversion to a diversified REIT focusing on multi-tenant retail properties. The Compensation Committee, with the assistance of Ferguson Partners, determined that ***"adjusted funds from operations," or "AFFO" would be the most appropriate metric to gauge management's effective operation of the Company's business as a REIT. As a result, for 2023, the Annual Incentive Plan allocation to the Company's AFFO per diluted share was 50%***.

This bonus structure remained in effect throughout the Class Period. Thus, the more Defendants inflated AFFO—something they did in each reporting period—the larger the bonuses they received.

115. According to an analysis conducted by Wolfpack Research, if Defendants did not artificially inflate CTO's AFFO, they would not have received their AFFO-target-based bonus in any year from 2021 to 2024:

| Management Bonus Analysis | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|
| **Proxy Filings** | | | | |
| AFFO Targets | | | | |
| **Threshold** | **$3.70** | **$1.67** | **$1.67** | **$1.50** |
| Target | $3.98 | $1.75 | $1.76 | $1.61 |
| Maximum | $4.25 | $1.83 | $1.95 | $1.80 |
| **Reported AFFO Per Share** | **$4.36** | **$1.83** | **$1.91** | **$2.00** |
| Industry Standard AFFO | 17,311 | 24,610 | 17,697 | 29,887 |
| Diluted Common Shares Outstanding | 5,892,270 | 18,508,201 | 22,529,703 | 25,401,176 |
| **Industry Standard AFFO Per Share** | **$2.94** | **$1.33** | **$0.79** | **$1.18** |
| **Does Management Get Paid Under Industry Standard AFFO?** | **NO** | **NO** | **NO** | **NO** |

**Source:** Wolfpack Analysis

116. *Eighth*, the Wolfpack Report highlighted how CTO's manipulation of AFFO by not including CapEx led to CTO having an aggregate of a "$31.2 million shortfall in covering the paid common dividends." Thus, CTO had the financial motivation to manipulate its AFFO to entice investors to invest more in CTO because the Company needed new investments to cover its inflated dividend. Throughout the Class Period, CTO authorized the issuance of securities, via SEC Form S-3, in the aggregate amount of $1.35 billion.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

117. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CTO common shares during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

118. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CTO common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CTO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

119. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

120. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

121. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CTO;
- whether the Individual Defendants caused CTO to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of CTO's common shares during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

122. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

123. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- CTO's common shares are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and
- Plaintiffs and members of the Class purchased, acquired and/or sold CTO' common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

124. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

125. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Plaintiffs' claims sound primarily in omission of material facts in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

126. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

127. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

128. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CTO's common shares; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire CTO's common shares and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

129. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CTO securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CTO's finances and business prospects.

130. By virtue of their positions at CTO, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class,

or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

131. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the most senior executives of CTO, who undertook to lead CTO's accounting and to communicate CTO's financial results to investors including whether or not the AFFO reported allowed comparison to peers, the Individual Defendants had knowledge of the details of the truth concealed from investors.

132. Because of their positions of control and authority, and their exercise of such authority in managing the day-to-day operations of CTO and its investor communications, Defendants were able to and did, make false statements to investors about CTO's Adjusted Funds From Operations, which in turn overstated its financial condition and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CTO's common shares was artificially inflated throughout the Class

Period. In ignorance of the adverse facts concerning CTO's business and financial condition, which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired CTO's common shares at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

133. During the Class Period, CTO's common shares were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CTO's common shares at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of CTO's common shares was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of CTO's common shares declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

134. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

135. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common shares during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

136. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

137. During the Class Period, the Individual Defendants participated in the operation and management of CTO, and conducted and participated, both directly and indirectly, in the conduct of CTO's business affairs. Because of their senior positions, they knew the adverse non-public information about CTO's misstatement of AFFO, and the resulting impact on the sustainability of CTO's dividend.

138. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

with respect to CTO's financial condition and results of operations, and to correct promptly any public statements issued by CTO which had become materially false or misleading.

139. Exploiting their positions of control and authority as senior officers, the Individual Defendants culpably participated in CTO's securities violations and were able to, and did, control the contents of the various reports, press releases and public filings which CTO disseminated in the marketplace during the Class Period concerning CTO's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CTO to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of CTO within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CTO common shares.

140. Each of the Individual Defendants, therefore, acted as a controlling person of CTO. By reason of their senior management positions and/or being directors of CTO, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CTO to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CTO and possessed the power to control the specific

activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

141. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CTO.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: November 18, 2025

Respectfully submitted,

**POMERANTZ LLP**

/s/ Genc Arifi
Joshua B. Silverman (*pro hac vice*)
Genc Arifi (*pro hac vice*)
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 229-8811
jbsilverman@pomlaw.com
garifi@pomlaw.com

***Co-Lead Counsel for Co-Lead Plaintiffs Charles J. O'Connor, Jr. and Judy A. O'Connor and the Proposed Class***

**MILLER SHAH LLP**
Nathan C. Zipperian
Jayne A. Goldstein
2103 N. Commerce Parkway
Fort Lauderdale, Florida 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
nczipperian@millershah.com
jagoldstein@millershah.com

***Liaison Counsel for Co-Lead Plaintiffs Charles J. O'Connor, Jr. and Judy A. O'Connor***

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
(Fla. Bar No. 0182877)
Philip Kim, Esq.
(*pro hac vice* forthcoming)
Michael Cohen, Esq.
(*pro hac vice* forthcoming)

275 Madison Avenue, 40th Floor
New York, New York
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
mcohen@rosenlegal.com

***Co-Lead Counsel for Co-Lead Plaintiff Steven Sramowicz and the Proposed Class***