**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CHARLES J. O'CONNOR, JR., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; AND JUDY A. O'CONNOR, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED;**

**Plaintiffs,**

**v.** **Case No.: 6:25-cv-01516-AGM-CAB**

**CTO REALTY GROWTH, INC.; JOHN P. ALBRIGHT; MATTHEW M. PARTRIDGE; LISA M. VORAKOUN; AND PHILIP R. MAYS;**

**Defendants.**

---

**ORDER**

THIS CAUSE comes before the Court on review of the Magistrate Judge's report (Doc. # 57, the "Report and Recommendation"), which recommends that the Court grant Defendants' Motion to Dismiss (Doc. # 43; the "Motion"). Plaintiffs Charles J. O'Connor, Jr. and Judy A. O'Connor timely objected (Doc. # 62). Defendants responded (Doc. # 63). Additionally, Defendants filed a limited objection (Doc. # 61), to which Plaintiffs filed a response (Doc. # 64). After review, the Report is due to be adopted in part, the Motion is due to be granted, and the Amended Complaint (Doc. # 37) is due to be dismissed.

## I. BACKGROUND

In this securities fraud action, the Plaintiffs allege that the Defendants made false and misleading statements about CTO Realty Growth, Inc.'s ("CTO") financial reporting to investors and the public. CTO is a "Real Estate Investment Trust" ("REIT"), which means it is a company that derives most or all its income from owning, operating, and/or financing real estate. CTO owns and operates a portfolio of high-quality, retail-based properties located primarily in higher-growth markets in the United States.

Created by Congress in 1960 under the Real Estate Investment Trust Act, REITs are intended to provide a means by which even small investors can invest in large-scale real estate assets. To qualify as a REIT, a company must meet certain Internal Revenue Code criteria. One of those criteria is that REITs must distribute to their shareholders at least 90% of their annual taxable income as dividends.

REITs use Generally Accepted Accounting Principles ("GAAP") to prepare their primary financial statements. But certain features of GAAP can artificially distort a REIT's true operating value. To address that distortion, a global trade association for REITs called the National Association of Real Estate Investment Trusts (the "Trust") created supplemental, non-GAAP measures, including Funds from Operations ("FFO") and Adjusted Funds From Operations ("AFFO").

Between GAAP and AFFO, Plaintiffs allege that AFFO is viewed as a better predictor of a REIT's ability to continue or grow its dividends. Indeed, the Amended Complaint alleges that AFFO is a crucial metric for REITs and REIT investors to compare the performance of one REIT against another.

The Plaintiffs contend there is a commonly (but, crucially, not universally) accepted definition of AFFO: FFO – Normalized Recurring Capital Expenditures – Straight-line Rent Adjustments. Without alleging that there is a universal definition of AFFO, the Plaintiffs allege that the "REIT sector has widely adopted AFFO," AFFO has gained "significant acceptance and endorsement from leading financial institutions," and AFFO is "a critical metric for investment analysis."

The Plaintiffs allege that the Defendants artificially inflated CTO's value by refusing to subtract significant capital expenditures in its AFFO calculation. The Plaintiffs contend that this was contrary to accepted industry practice. They further allege that CTO urged investors to compare its AFFO with other REITs, even though the different AFFO methodology meant it was not an apples-to-apples comparison. The Plaintiffs say that this made CTO's value appear markedly higher than its peers, when it was not.

A critical short-seller report that purportedly exposed the difference in AFFO methodology led CTO's stock value to plunge. The Plaintiffs allege that they suffered substantial losses and damages. As a result, the Plaintiffs filed this case seeking recovery of their investment losses, alleging two claims: (1) a claim pursuant to section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (Count I); and (2) a derivative control-person claim under Section 20(a) (Count II).

The Defendants filed the Motion, raising several arguments in favor of dismissal: (1) the Amended Complaint was a shotgun pleading; (2) the Plaintiffs improperly relied on a short-seller report consisting of public information and anonymous, unconfirmed opinions, which did not constitute the corrective disclosure necessary to establish loss causation; (3) the

Plaintiffs' generalized allegations failed to satisfy the particularity requirements for pleading (a) scienter and (b) materially false or misleading statements; and (4) the failure to sufficiently plead a § 10(b) claim was fatal to the Plaintiffs' § 20(a) claim.

The Motion was referred to the Magistrate Judge for a Report and Recommendation. In a thorough and well-reasoned analysis, the Magistrate Judge recommended that the Court grant the Motion and dismiss the Amended Complaint. Although the Magistrate Judge found that the Amended Complaint was not a shotgun pleading and was otherwise sufficient, the Report and Recommendation concluded that the allegations failed to satisfy the particularity requirements for pleading scienter under the § 10(b) claim, and accordingly, that the derivative § 20(a) claim failed, as well. In response, both parties filed timely objections to the Report and Recommendation.

## II. LEGAL STANDARD

When a party makes timely and specific objections to the report and recommendation of the magistrate judge, the district judge shall conduct a de novo review of the portions of the record to which objection is made. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990). After an independent review, the district judge may accept, reject, or modify the magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Macort v. Prem, Inc.*, 208 F. App'x 781, 783–84 (11th Cir. 2006) (citing published opinion). The objecting party must state with particularity findings with which it disagrees, along with its basis for the disagreement. *Kohser v. Protective Life Corp.*, 649 F. App'x 774, 777 (11th Cir. 2016) (citing *Heath*

*v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989)). The Court will not consider "[f]rivolous, conclusive, or general objections." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use "in connection with the purchase or sale of any security" of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations" as the Securities and Exchange Commission may prescribe. 15 U.S.C. § 78j(b). One of those rules is Rule 10b-5. Rule 10b-5 makes it unlawful to make materially untrue statements or omissions. 17 C.F.R. § 240.10b-5(b). There is no private right of action spelled out in the text, but the Supreme Court has implied a private right of action under Rule 10b-5. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).

The net effect is that a claim under Rule 10b-5 is subjected to a triple-pleading standard. *Id.* A claim must satisfy more than just the general pleading requirements of Federal Rule of Civil Procedure 8(a)(2). It must also satisfy (1) Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for fraud and (2) the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA"). *Carvelli*, 934 F.3d at 1317–18.

Under Rule 9(b), a plaintiff asserting a fraud claim must state "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally," but a plaintiff must also allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross &*

*Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997). Under the PSLRA, pleading requirements are further heightened, and a plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). A plaintiff's failure to meet any of the three standards will result in the court dismissing the complaint. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

## III. ANALYSIS

To succeed on a fraud claim under section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5, and the PSLRA, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citation modified).

In relevant part, the Magistrate Judge concluded that the Plaintiffs' allegations established a corrective disclosure based on the publication of the short-seller report, but failed to establish scienter as to the individual Defendants. The Magistrate Judge recommended dismissal on that basis. Plaintiffs object to the Magistrate Judge's finding and urge the Court deny the Motion. Defendants, on the other hand, narrowly object to the Report's finding that the short-seller report was a corrective disclosure that caused Plaintiffs' economic losses. Otherwise, the Defendants ask this Court to adopt the Report and grant the Motion. These objections are considered in turn.

**A. Plaintiffs' Objection (Scienter)**

To successfully plead scienter in a securities fraud claim, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)). Under section 10(b) and Rule 10b-5, the plaintiff must establish "scienter," which is to show either an "intent to deceive, manipulate, or defraud," or "severe recklessness." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 (11th Cir. 1999) (internal quotations omitted).

A "strong inference" of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Carvelli*, 934 F.3d at 1318. "Severe recklessness is limited to '*highly unreasonable* omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an *extreme departure* from the standards of ordinary care.'" *Bhatt v. Tech Data Corp.*, No. 17-cv-02185, 2018 WL 6504375, at *5 (M.D. Fla. Dec. 11, 2018) (quoting *Durgin v. Mon*, 415 F. App'x 161, 164, 166 (11th Cir. 2011)). Where there are multiple defendants, the plaintiff must allege facts supporting a strong inference of scienter "for each defendant with respect to each violation." *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004). In sum, the Plaintiffs must plead "with particularity facts giving rise to a strong inference" how each individual Defendant either intended to defraud investors or acted with severe recklessness when they made the alleged materially false or incomplete statements. *Id.* at 1017.

Here, the challenged statements include the Defendants' quarterly and annual reports, SEC filings, press releases, statements in earnings calls, and other statements and documents

related to CTO's purportedly misleading AFFO calculation. According to the Plaintiffs, their core theory of scienter is that the Defendants knew CTO excluded capital expenditures in its AFFO calculation but nevertheless encouraged investors to compare its AFFO with that of peer companies who included those expenditures.

The Plaintiffs contend that scienter was adequately pled. They object to the Report's finding because: (1) the Defendants urged investors to compare its AFFO to other businesses while knowing substantial capital expenditures were excluded from its calculation, contrary to the calculation used by peers; (2) the Report faults the Plaintiffs for failing to allege that the Defendants were "informed that CTO's AFFO methodology materially diverged from" other peer companies; (3) the Report fails to address allegations that the Defendants designed CTO's AFFO metric to be different from peers with the intent to inflate CTO's performance; and (4) the Report's holistic analysis fails for the same reasons.

After a de novo review, the reasoning outlined in the Report as to Plaintiffs' failure to sufficiently allege scienter is sound. That reasoning is adopted in full. *See Williams v. Omega Labs. Inc.*, 2026 WL 1847300, at *2 (11th Cir. June 26, 2026) (holding that a district court need not "restate what was already detailed" by the Magistrate Judge and adopted into the order). None of the individual allegations put forth by the Plaintiffs are sufficient to establish scienter. Even looking at those allegations holistically, the Magistrate Judge logically concluded that the more cogent and compelling inference is "that Defendants employed and publicly disclosed a methodology for calculating a non-GAAP metric, explained their rationale for using that methodology, and were later criticized by a short seller who disagreed with the treatment of capital expenditures." (Doc. # 57 at 28.)

Indeed, allegations within the Amended Complaint and related attachments support this finding. The Plaintiffs acknowledge that their preferred definition of AFFO, which includes deductions of recurring capital expenditures, is the "commonly accepted definition" and has been "widely adopted" in the industry. But the qualifiers of "commonly" and "widely" suggest that that definition has not been "universally" adopted. Without a consensus as to a single, standardized definition of AFFO, REITs are free to use a specific methodology to their benefit, so long as it is not otherwise fraudulent or misleading. Even the short-seller report relied upon by the Plaintiffs concedes that "[n]ot every REIT includes recurring capex in their AFFO" while nevertheless referring to CTO's practices as "highly unusual." (Doc. # 44-3 at 15.) "Unusual" and "misleading" are not synonyms, especially in this context.

Even so, the Plaintiffs contend that the Defendants urged investors to compare its AFFO with other REITs because non-GAAP measures like AFFO "are useful to investors because they are widely accepted industry measures used by analysts and investors to compare the operating performance of REITs." But in CTO's financial reporting, such statements were accompanied by a cautionary disclaimer that "AFFO may not be comparable to similarly titled measures employed by other companies." The Plaintiffs argue that this kind of statement is an admission of guilt, but that argument fails a plausibility test. CTO's statements are consistent with what the Plaintiffs pled, which is that there was not a uniform measure of AFFO.

Taking the allegations of the Amended Complaint as a whole, the facts alleged do not give rise to a "strong inference" that the individual Defendants either (1) knew the AFFO calculation was misleading, or (2) otherwise acted with severe recklessness. *See Mizzaro*, 544

F.3d at 1238. No "smoking-gun" is required to establish scienter, *see Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007), and no evidence is required at the pleading stage. However, the Amended Complaint's allegations comprising of corporate knowledge, earnings calls, SEC filings, and general financial reporting, do not give rise to the requisite strong inference that any Defendant acted with the scienter. Accordingly, a de novo review affirms that the Plaintiffs failed to adequately plead scienter, and the objection is due to be overruled.

**B. Defendants' Objection (Corrective Disclosure)**

The Magistrate Judge found that the short-seller report may constitute a corrective disclosure, and because the report revealed previously undisclosed information, the Plaintiffs adequately pled loss causation. The Defendants object to this finding, asserting that the short-seller report should be disqualified based on its self-admitted (1) financial motivation, (2) reliance on anonymous sources, and (3) disclaimers regarding its own accuracy. For these reasons, the Defendants urge this Court to find that the short-seller report does not constitute a corrective disclosure. This objection is due to be sustained.

Unlike the heightened pleading requirements with respect to fraud and scienter, loss causation is analyzed under the general pleading requirements of Rule 8(a) and need not be pleaded with particularity. *Jastram v. NextEra Energy, Inc.*, 161 F.4th 693, 707 (11th Cir. 2025). Plaintiffs may demonstrate loss causation circumstantially, by:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311–12 (11th Cir. 2011) (footnote omitted). "Corrective disclosures can come from any source and take any form from which the market can absorb the information and react." *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1242 (11th Cir. 2023) (citation modified).

In analyzing the sufficiency of a short-seller report, the Eleventh Circuit in *Meyer v. Greene* stated that "the mere repackaging of already-public information by an analyst or short-seller" was insufficient to constitute a corrective disclosure. 710 F.3d 1189, 1199 (11th Cir. 2013). The court opined that a short-seller's opinion may constitute a corrective disclosure, but such an opinion would have to be "factual or revelatory in nature" or, at the very least, "reveal to the market something previously hidden or actively concealed." *Id.* n.10; *see also FindWhat*, 658 F.3d at 1311 n.28 (explaining that a corrective disclosure "obviously must disclose new information").

In the Report, the Magistrate Judge correctly noted that the Eleventh Circuit has not imposed a categorical ban on the use of short-seller publications as corrective disclosures. Because the short-seller report revealed undisclosed information to the public for the first time, the Magistrate Judge concluded that it was a corrective disclosure.

But the absence of a ban does not mean that all short-seller publications are corrective disclosures. In this case, the short-seller publication is so fundamentally problematic that it cannot be plausibly considered a corrective disclosure, even if the Eleventh Circuit has left open the possibility that other short-seller reports could be sufficient.

As the Plaintiffs themselves acknowledge, the short-seller report in this case was biased, relied on anonymous sources, and disclaimed its own accuracy. Other Circuits have held,

based on highly persuasive reasoning, that similar short-seller publications were not a corrective disclosure. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022); *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781 (9th Cir. 2020); *Defeo v. IonQ, Inc.*, 134 F.4th 153 (4th Cir. 2025).

*Nektar Therapeutics* involved a short-seller report that claimed an anti-cancer drug was less effective than it had been held out to be. 34 F.4th at 834–35. Stating that it is a "high bar that plaintiffs must meet in relying on self-interested and anonymous short-sellers," the Ninth Circuit definitively declared that the "[short-seller] Report [] contained a disclaimer that its authors 'make no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information' in the report" and thus, it could not serve as a corrective disclosure. *Id.* at 834, 839. The Ninth Circuit held that where authors of a report are "anonymous and self-interested short-sellers who disavowed any accuracy," their reports are "rendered . . . inadequate" for purposes of pleading loss causation. *Id.* at 840.

Similarly, *Bofl Holding, Inc.* considered whether anonymous blog posts from short sellers who disclaim their own accuracy could constitute corrective disclosures for purposes of pleading loss causation in a security fraud case. 977 F.3d at 797. The Ninth Circuit said the answer to that question is "no." It said

> the posts were authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made "no representation as to the accuracy or completeness of the information set forth in this article." A reasonable investor reading these posts would likely have taken their contents with a healthy grain of salt. Therefore, the shareholders have not plausibly alleged that any of the [] blog posts constituted a corrective disclosure.

*Id.*

Here, the short-seller report bears all the hallmarks of unreliability discussed by the Fourth and Ninth Circuits. First, the report held itself out to be an "expression[] of opinion" and it made "no representation, express or implied, as to the accuracy, timeliness or completeness of any such information." Outrageously, the short-seller report in this case says

> We obviously believe all statements included in our report made by former employees, confidential sources, experts, and whistleblowers are reliable (we think everything we say or cite is reliable); however, you should know that these sources likely are not just biased but may even have a financial interest in our short report. We sometimes pay former employees indirectly through an expert network to speak with us, and these former employees may hold a grudge against their former employer. In some cases, we directly pay our sources a fixed fee or enter into a profit-sharing agreement with a source. In cases where we believe a whistleblower suit with a regulatory agency is appropriate, we may share a financial interest with a source in the potential award.

(Doc. # 43-1 at 30.)

It would be totally inconsistent with other basic principles of American justice to allow something so clearly unreliable to serve as a basis for loss causation. It is not necessary to be an expert in securities fraud to understand all that is wildly wrong with this scenario. If loss causation could be predicated on a short-seller report based on (1) anonymous sources (2) who could be disgruntled former employees who "may hold a grudge against their former employer" and (3) are not only *admittedly* biased *but also* (4) compensated for their "contribution" to the report, (5) given a share in the upside of the short, *and* (6) given a share of any potential award in a regulatory action, then predatory short-sellers could fabricate allegations that allow the short-seller to not only destroy an innocent business, but also feast on its carcass, all with little potential accountability. In other contexts, one might call *that* fraud. *Fraud*, *Black's Law Dictionary* (12th ed. 2024) (defining fraud as either a knowing

misrepresentation or "[a] reckless misrepresentation made without justified belief in its truth to induce another person to act.").

So, while it is true that the Eleventh Circuit has not said a short-seller report could never be a corrective disclosure, there are ample reasons to conclude that *this* short-seller report will not do. "While all short seller reports will likely share the same ulterior profit motivation, not all will rely entirely on anonymous sources for their incendiary claims, disclaim the accuracy of their opinions as well as that of the non-public source material from which it claims those opinions derived, and admit to tailoring quotations to fit the publisher's narrative." *Defeo*, 134 F.4th at 164.

Because the short-seller report here was insufficient to constitute a corrective disclosure, the Defendants' objection is due to be sustained.

## IV. CONCLUSION

The Report and Recommendation is adopted in part, except to the extent that it concluded that the short-seller report was a corrective disclosure. To that extent, the Defendants' objections are sustained. Consistent with the Report, the Motion is due to be granted, and the Amended Complaint dismissed. Because the short-seller report here was insufficient to constitute a corrective disclosure, dismissal is with prejudice.

Accordingly, it is now

**ORDERED** and **ADJUDGED** that:

1. The Report and Recommendation (Doc. # 57) is **ADOPTED** in part;
2. The Motion to Dismiss (Doc. # 43) is **GRANTED**;
3. Plaintiffs' Objections (Doc. # 62) are **OVERRULED**;

4. Defendants' Objections (Doc. # 61) are **SUSTAINED**;

5. The Amended Complaint (Doc. # 37) is **DISMISSED with prejudice**; and

6. The Clerk is directed to **TERMINATE** any remaining pending motions and **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Orlando, Florida, on this September 25, 2026.

**ANNE-LEIGH GAYLORD MOE**
UNITED STATES DISTRICT JUDGE

**Copies Furnished To:**
Counsel of Record